UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Criminal No.    25cr10355 |
| ) | |
| v.                         ) | Violations: |
| ) | |
| SCOTT KELLEY,              ) | Counts One - Five: Wire Fraud |
| ) | (18 U.S.C. § 1343) |
| Defendant       ) | |
| ) | Counts Six - Ten: Mail Fraud |
| ) | (18 U.S.C. § 1341) |

Counts One - Five: Wire Fraud
(18 U.S.C. § 1343)

Counts Six - Ten: Mail Fraud
(18 U.S.C. § 1341)

Counts Eleven - Fifteen: Mail Theft by Postal Officer
(18 U.S.C. § 1709)

Count Sixteen: Theft of Government Money
(18 U.S.C. § 641)

Counts Seventeen - Thirty-Nine: Money Laundering,
Illegal Concealment
(18 U.S.C. § 1956(a)(1)(B)(i))

Count Forty: Structuring to Evade Reporting
Requirements
(31 U.S.C. § 5324(a)(3))

Counts Forty-One - Forty-Five: Filing False Tax
Returns
(26 U.S.C. § 7206(1))

Wire and Mail Fraud Forfeiture Allegation:
(18 U.S.C. § 981(a)(1)(C) and
28 U.S.C. § 2461(c))

Theft of Government Money Forfeiture Allegation:
(18 U.S.C. 981(a)(1)(C) and 28 U.S.C. § 2461(c))

Money Laundering Forfeiture Allegation:
(18 U.S.C. § 982(a)(1))

Structuring Forfeiture Allegation:
(31 U.S.C. § 5317(c)(1))

INDICTMENT

At all times relevant to this Indictment:

General Allegations

1.  Defendant SCOTT KELLEY was a resident of Pembroke, Massachusetts.

2.  The United States Postal Inspection Service ("USPIS") was the law enforcement, crime prevention, and security arm of the U.S. Postal Service. Its primary mission was to protect postal customers from criminal misuse of the mail system. Among other things, the USPIS investigated the laundering of illicit proceeds, such as proceeds derived from mail fraud, embezzlement, tax evasion, and the sale of narcotics. U.S. Postal Inspectors were federal law enforcement officers who carried firearms, made arrests, executed federal search warrants, and served subpoenas.

3.  The Boston Division of the USPIS covered Massachusetts, Connecticut, Rhode Island, New Hampshire, Maine, Vermont, and upstate New York. The Boston Division Headquarters ("DHQ") was located on the sixth floor of the Barnes Building, 495 Summer Street in Boston.

4.  KELLEY was a Postal Inspector who worked at DHQ.

5.  KELLEY was the Team Leader of the Mail Fraud and Money Laundering Investigations Unit (the "Mail Fraud Unit") from in or about 2015 until on or about June 18, 2022. The Mail Fraud Unit investigated financial fraud schemes that used the mail, including, for example, healthcare fraud, money laundering, and telemarketing schemes. Among other things, the Mail Fraud Unit investigated lottery and other scams that targeted senior citizens and other vulnerable populations.

6.  As part of a DHQ reorganization, KELLEY was transferred to the Mail Theft,

Robbery, and Security Investigations Unit (the "Mail Theft Unit") on or about June 18, 2022.

The Mail Theft Unit investigated theft and destruction of mail, robberies and other crimes

against postal employees, and burglaries of postal facilities. The Mail Theft Unit did not

investigate mail fraud scams. KELLEY was the Team Leader of the Mail Theft Unit from on or

about June 18, 2022, until on or about August 11, 2023.

### The JOLT Program

7.      Working with Jamaican law enforcement agencies, the USPIS ran a nationwide

crime-prevention program called Jamaican Operations Linked to Telemarketing ("JOLT"). The

goal of the JOLT program was to disrupt mail fraud scams originating in Jamaica that targeted

U.S. residents with false promises of sweepstakes or lottery winnings. Posing as lottery

representatives, the scammers contacted elderly persons and other vulnerable victims and

persuaded them to mail funds to pay "fees" or "taxes" that they supposedly needed to front

before they could collect their prize. Victims mailed the funds, often in cash; the scammers kept

the money; and the victims received nothing.

8.      In DHQ, only Postal Inspectors in the Mail Fraud Unit worked on the JOLT

program.

9.      Postal Inspectors working on the JOLT program tried to prevent scam victims

from losing their money. They were authorized to intercept packages in the mail stream that they

suspected were sent by JOLT victims. But they were authorized to open these packages only

with the senders' consent. If a sender did not give consent, the Inspector was required to

overwrap the unopened parcel (*i.e.*, put it in another postal envelope bearing a different tracking

number), and mail it back to the sender. If the sender consented, the Inspector could open the

package and then --

a. If the package contained non-cash financial instruments (*e.g.*, money orders, checks, gift cards), the Inspector was required to return the contents to the sender.

b. If the package contained cash, the Inspector was required to count the cash with another Inspector present as a witness, and then have the cash converted to an official check issued by Hanscom Federal Credit Unit, where USPIS had an account and which had a branch in the Barnes Building. The Inspector then mailed or delivered the check to the sender.

### KELLEY's Fraud Scheme to Steal Cash
### Mailed by JOLT Victims

10.     From a date no later than in or about February 2016 through on or about August 11, 2023, KELLEY employed a fraud scheme to steal cash mailed by JOLT scam victims, using deceptive emails to cause unwitting postal employees to intercept the victims' packages and mail them to KELLEY. To prevent detection of his theft, KELLEY concealed the proceeds of his scheme by, among other things, using cash to pay for money orders and goods and services.

*Manner and Means of the Fraud Scheme*

11.     KELLEY engaged in the following manner and means, among others, as part of his fraud scheme:

a. Directing administrative employees, when KELLEY was Team Leader of the Mail Fraud Unit, to identify JOLT parcels en route from or to an address in Massachusetts and email the post offices for the destination addresses with requests to intercept the parcels and mail them to KELLEY;

b. Concealing his intention to open the parcels and steal any cash inside them,

and instead misleading the administrative employees into believing that his

directives were in furtherance of actual fraud investigations;

c. After he was transferred to the Mail Theft Unit, sending intercept-request

emails himself and changing the title in his signature block to "Team Leader"

without identifying his unit, to conceal the fact that his intercept requests were

not coming from a Mail Fraud Inspector;

d. Secretly opening parcels that were intercepted and mailed to him;

e. Stealing cash contained in the parcels;

f. Keeping no paper or digital record of any parcel from which he stole cash;

g. Feigning ignorance when senders complained to USPS that their packages had

not been delivered, and pretending that those packages must have been lost in

the mail; and

h. Concealing the cash proceeds of his fraud scheme, by, among other things,

   i. Paying cash for postal money orders;

   ii. Putting the names of relatives in the "Payer" section of money orders

without their knowledge and even though they did not pay for the

money orders;

   iii. Always buying less than $3,000 in money orders from any one post

office on any one day, to evade federal reporting requirements; and

   iv. Using cash to pay for goods and services.

*KELLEY Used Unwitting USPIS Employees to Send Deceptive
and Misleading Emails to Postal Employees, Who, Unaware of
KELLEY's Scheme, Intercepted JOLT Parcels and Sent Them to Him*

12.     KELLEY's method of identifying JOLT packages to intercept changed over time.

13.     Starting in or about February 2016, KELLEY relied on automated "mail watch" emails indicating that a parcel was en route to one of numerous Massachusetts addresses that KELLEY had registered with USPIS National Inspection Service Analytics ("NISA"); these were addresses where JOLT packages had been sent before. When KELLEY received a "mail watch" email, he emailed the post office for the destination address, directly or through an administrative employee, asking that the parcel be intercepted and sent to him.

14.     On or about September 11, 2018, KELLEY increased the number of JOLT packages he could identify by asking "Administrative Employee One" to create a twice-daily JOLT report using data in a Postal Service system that tracked Priority Mail and Priority Mail Express packages.[1] KELLEY told Administrative Employee One to use a reverse IP address search on the data to locate any packages mailed that day or the day before to or from an address in Massachusetts. KELLEY wrote in his email to Administrative Employee One: "If located attempt to intercept and have sent to my attention at DHQ." Administrative Employee One followed KELLEY's directive.

15.     Between in or about July 2016 and in or about December 2018, KELLEY paid approximately $35,100 cash to buy a total of approximately 40 postal money orders at various post offices in Massachusetts, all of which he deposited into his account no. -0422 at USAA

---

[1]  Scammers often told victims to send money using Priority Mail, which guarantees delivery in 2-3 business days, or Priority Mail Express, which guarantees delivery in 1-3 days, so they would get the funds as fast as possible and before the victims changed their minds.

Federal Savings Bank.

16.     On or about May 16, 2019, KELLEY began receiving NISA's daily automated national JOLT Report ("JOLT Report"). NISA generated the JOLT Report using an algorithm targeted to identify packages in the nationwide mail stream that likely had been sent by JOLT victims. The JOLT Report listed these packages by tracking number, city/town/zip code they were mailed from, destination address, date of mailing, and expected delivery date. KELLEY's receipt of the JOLT Report expanded his ability to identify JOLT packages because he no longer had to rely on Administrative Employee One's identification efforts based on less data.

17.     Starting on or about May 16, 2019, KELLEY forwarded the daily JOLT Report to Administrative Employee One until Administrative Employee One's retirement in or about November 2021. KELLEY then began forwarding the daily JOLT Report to "Administrative Employee Two."

18.     KELLEY directed Administrative Employees One and Two to review the JOLT Reports, identify the parcels en route to or from a Massachusetts address, and email the post offices for the destination addresses with requests to intercept the parcels and mail them to KELLEY.

19.     KELLEY intended to open any intercepted parcel that looked and/or felt like it might contain cash and steal any cash inside. However, he did not disclose his scheme to Administrative Employee One or Administrative Employee Two. Instead, KELLEY misled them into believing that his directive was in furtherance of actual fraud investigations.[2]

---

[2] As the Team Leader of the Mail Fraud Unit, KELLEY approved JOLT and other mail fraud investigations but was not expected to open any of his own. Between on or about January 1, 2019, and on or about June 17, 2022, KELLEY approved the opening of only approximately six JOLT investigations.

20.     KELLEY caused the unwitting administrative employees to email post offices across the country asking that parcels be intercepted and sent to KELLEY. KELLEY, who was copied, knew the emails were deceptive and misleading because they appeared to be legitimate requests in furtherance of actual fraud investigations.

21.     When KELLEY was transferred to the Mail Theft Unit on or about June 18, 2022, he did not notify the administrator of the JOLT Report email distribution list that he was no longer working on the JOLT program. KELLEY continued receiving the daily JOLT Report, which was a critical part of his scheme.

22.     KELLEY knew, when he was transferred to the Mail Theft Unit, that an administrative employee would be suspicious if KELLEY asked them to send intercept-request emails for suspected JOLT packages because the Mail Theft Unit did not work on the JOLT program. Instead, KELLEY started sending the emails himself.

23.     When he was the Team Leader of the Mail Fraud Unit, KELLEY included the name of his unit in his signature block. For example:

| From: | "Kelley, Scott W - Boston, MA" <swkelley@uspis.gov> |
|-------|----|
| To: | ▮▮▮▮▮▮▮▮▮▮@usps.gov> |
| Date: | Wed, 17 Jul 2019 13:42:45 +0000 |

Bob

You can send to me in Boston and tell him USPIS will return to sender.

Scott W. Kelley
Team Leader MF/MLI
495 Summer Street, Suite 600
Boston, MA 02210
Office ▮▮▮▮
Cell ▮▮▮▮▮

24.     However, when KELLEY was moved to the Mail Theft Unit, he changed the title in his signature block to "Team Leader" to conceal from the email recipients the fact that he was

not in the Mail Fraud Unit. For example:



**Request to Intercept 9570 1120 3042 2284 7616 57**

From: *Kelley, Scott W - Boston, MA* <swkelley@uspis.gov>
To: - Waltham, MA* [redacted] @usps.gov>, [redacted] - Belmont, MA*
[redacted] @usps.gov>
Date: Wed, 12 Oct 2022 08:31:46 -0400

Good Morning,

I am making a request to intercept a Priority Express mail piece bearing USPS Tracking Number **9570 1120 3042 2284 7616 57**

PTR is showing this mail piece is in route to your office

|  | lass/Service |
|---|---|
| **Class/Service:** | Priority Mail Express PO-Add Signature Waived |
| **Class of Mail Code/Description:** | EX / Priority Mail Express 1-Day® |

**Destination Address Information**

| | |
|---|---|
| **Address:** | [redacted] |
| **City:** | WALTHAM |
| **State:** | MA |
| **5-Digit ZIP Code:** | 02451 |
| **4-Digit ZIP Code add on:** | 3311 |
| **Delivery Point Code:** | 08 |
| **Record Type Code:** | Street Record |
| **Delivery Type:** | Residential, Other |

If you are able to intercept this mail piece please, scan the mail piece delivered and send the mail piece to:

US Postal Inspector, Scott Kelley
US Postal Inspection Service
495 Summer Street, Ste., 600
Boston, MA 02210



Scott W. Kelley
Team Leader
495 Summer Street, Suite 600
Boston, MA  02210
Office  61[redacted]
Cell  617[redacted]

25.     Between in or about January 2019 and on or about August 11, 2023, KELLEY

requested or caused to be requested that approximately 1,950 JOLT parcels be intercepted and

mailed to him.

## **Sample Victims**

26.     KELLEY's victims included, but were not limited to, the persons identified below

as Victim One, Victim Two, Victim Three, Victim Four, Victim Five, Victim Six, and Victim

Seven.

*Victim One*

27.      Victim One lived in Bison, Kansas.

28.      In or about June 2019, a scammer who communicated with Victim One by phone

persuaded Victim One to mail approximately $19,100 cash to an address in Centerville,

Massachusetts, using Priority Mail Express. Victim One was 76 years old.

29.      On or about June 24, 2019, Victim One mailed Priority Mail Express package

bearing tracking number EJ036304193US, which contained approximately $19,100 cash, from

Ottawa, Kansas to an address in Centerville, Massachusetts.

30.      On or about June 25, 2019, KELLEY received a JOLT Report by automated

email that included parcel EJ036304193US, among other packages. KELLEY forwarded the

report to Administrative Employee One.

31.      On or about June 25, 2019, Administrative Employee One emailed postal staff in

Centerville, Massachusetts, asking that they intercept Priority Mail Express package

EJ036304193US and send it to KELLEY.

32.      Unaware of KELLEY's scheme, postal staff in Centerville intercepted package

EJ036304193US, overwrapped it, and mailed it to KELLEY. The overwrapped package was

delivered to DHQ on or about June 26, 2019.

33.      KELLEY opened Victim One's package without Victim One's consent, and stole

the cash inside.

34.      On or about June 25, 2019, Victim One filed a complaint with the Postal Service,

stating that their package had not been delivered and asking what had happened to it. The

unwitting Postmaster in Centerville, Massachusetts emailed the complaint to KELLEY as the

Team Leader of the Mail Fraud Unit at DHQ, asking, "How would you like us to proceed or will

the USPIS handle this [complaint] from here?" KELLEY sent a same-day reply directing that the complaint investigation be closed. The Centerville Postmaster replied, "Thanks for the prompt reply Scott. Done."

35. On or about July 1, 2019, Victim One followed up on their complaint. On or about July 2, 2019, an unwitting Postal Service Consumer Affairs employee emailed KELLEY, stating, "Please assist with a package that was intercepted by USPIS. Customer is upset and would like to know who has [their] package." KELLEY sent a same-day reply email directing Consumer Affairs to close out the complaint investigation.

36. Victim One never recovered their package or any of their cash.

*Victim Two*

37. Victim Two lived in Prentiss, Mississippi.

38. In or about July 2020, a scammer who communicated with Victim Two by phone persuaded Victim Two to mail approximately $7,500 cash to an address in Lowell, Massachusetts. Victim Two was 82 years old and retired.

39. On or about July 28, 2020, Victim Two mailed Priority Mail Express package bearing tracking number EJ402293532US, which contained approximately $7,500 cash, from Prentiss, Mississippi to an address in Lowell, Massachusetts.

40. On or about July 29, 2020, KELLEY received a JOLT Report by automated email that included parcel EJ402293532US, among other packages. KELLEY forwarded the report to Administrative Employee One.

41. On or about July 29, 2020, Administrative Employee One emailed the Postmaster in Lowell, Massachusetts, asking that they intercept Priority Mail Express package EJ402293532US and send it to KELLEY.

11

42.     Unaware of KELLEY's scheme, postal staff in Lowell intercepted package EJ402293532US, overwrapped it, and mailed it to KELLEY. The overwrapped package was delivered to DHQ on or about August 4, 2020.

43.     KELLEY opened Victim Two's package without Victim Two's consent, and stole the cash inside.

44.     On or about August 24, 2020, a relative of Victim Two filed a complaint with the Postal Service stating that Victim Two had been scammed into mailing a package containing $7,500 cash to an address in Lowell, MA; the package did not bear a return address; and Victim Two wanted their package back. The complaint form noted that the parcel had been scanned "Insufficient Address" in Lowell on July 30, 2020.

45.     On or about November 13, 2020, the Lowell Postmaster emailed KELLEY: "Not sure how true this story is but the [relative] of this elderly [person] sent cash to [the address in Lowell] with no return address. Is this one you intercepted?" KELLEY did not reply.

46.     Victim Two never recovered their package or any of their cash.

### *Victim Three*

47.     Victim Three lived in Frankfort, Indiana.

48.     In or about May 2021, a scammer who communicated with Victim Three by phone persuaded Victim Three to mail approximately $2,000 cash to an address in Hyannis, Massachusetts. The scammer told Victim Three to place the bills between pages in a magazine and send the magazine using Priority Mail Express.[3] Victim Three was 78 years old and retired.

---

[3] As KELLEY knew, scammers often told victims not only to mail cash, but to place the bills between pages of a book or magazine, because this would make someone feeling the package less likely to suspect that it contained cash.

49.     On or about May 10, 2021, Victim Three mailed Priority Mail Express package bearing tracking number EJ608818052US, which contained approximately $2,000 cash, from Frankfort, Indiana, to an address in Hyannis, Massachusetts.

50.     On or about May 11, 2021, KELLEY received a JOLT Report by automated email that included parcel EJ608818052US, among other packages. KELLEY forwarded the report to Administrative Employee One.

51.     On or about May 11, 2021, Administrative Employee One emailed the postmaster in Hyannis, Massachusetts, asking that they intercept Priority Mail Express package EJ608818052US and send it to KELLEY.

52.     Unaware of KELLEY's scheme, postal staff in Hyannis intercepted package EJ608818052US, overwrapped it, and mailed it to KELLEY. The overwrapped package was delivered to DHQ on or about May 14, 2021.

53.     KELLEY opened Victim Three's package without Victim Three's consent, and stole the cash inside.

54.     Victim Three never recovered their package or any of their cash.

### *Victim Four*

55.     Victim Four lived in Waltham, Massachusetts.

56.     In or about December 2021, a scammer who communicated with Victim Four over social media and by email persuaded Victim Four to mail approximately $5,400 cash to an address in Checotah, Oklahoma, using Priority Mail Express. Victim Four was 78 years old and retired.

57.     On or about December 30, 2021, Victim Four mailed Priority Mail Express package bearing tracking number EJ833357790US, which contained approximately $5,400 cash,

13

from Waltham, Massachusetts, to an address in Checotah, Oklahoma.

58.     On or about January 3, 2022, Victim Four reported to a Waltham post office employee (the "Waltham Postal Employee") that Victim Four had been scammed into mailing $5,400 cash from Waltham to Checotah, Oklahoma, in a Priority Mail Express parcel bearing tracking number EJ833357790US and wanted their package back. The Waltham Postal Employee was unaware of KELLEY's scheme.

59.     On or about January 3, 2022, the Waltham Postal Employee called DHQ to relay Victim Four's complaint. A USPIS employee, who was also unaware of KELLEY's scheme, documented the call, writing: "[Victim Four] mailed $5,400.00 cash to a PO Box in Checotah OK 74426. The express … has not been delivered yet and the customer knows [they were] scammed and is upset about [their] money and would like it back." The employee emailed their report to KELLEY.

60.     On or about January 3, 2022, KELLEY forwarded the employee's report to Administrative Employee Two, writing, "Can you please try to intercept…"

61.     On or about January 3, 2022, Administrative Employee Two emailed the Postmaster in Checotah, Oklahoma, asking that they intercept Priority Mail Express package EJ833357790US and send it to KELLEY.

62.     Unaware of KELLEY's scheme, postal staff in Checotah, Oklahoma intercepted package EJ833357790US, overwrapped it, and mailed it to KELLEY. The overwrapped package was delivered to DHQ on or about January 6, 2022.

63.     KELLEY opened Victim Four's package without Victim Four's consent and stole the cash inside.

64.     The Waltham Postal Employee followed up with DHQ. They were connected

14

with KELLEY as the Team Leader of the Mail Fraud Unit. Starting on or about January 10, 2022, the Waltham Postal Employee called and texted KELLEY on multiple occasions about Victim Four's complaint. KELLEY repeatedly said he would look into it. During their last communication, KELLEY threatened to have the Waltham Postal Employee fired if they contacted KELLEY again. The Waltham Postal Employee stopped contacting KELLEY because of his threat.

65.    After making additional unsuccessful attempts to get their money back, including contacting the police and a U.S. senator, Victim Four reached out to a local Boston media outlet for help. The media outlet emailed USPIS on or about November 2, 2022. Unaware of KELLEY's scheme, the USPIS employee who received the email forwarded it to him. On or about November 2, 2022, KELLEY replied, "Unfortunately, as you know this happens often, we are not even sure where the package ended up or if it was delivered…." KELLEY knew that his response was false and misleading.

66.    The media outlet continued to press USPIS. Eventually KELLEY arranged to meet with Victim Four at their home in Waltham. The meeting took place on or about November 16, 2022. A Waltham police officer was also present, at Victim Four's request. KELLEY falsely told Victim Four that he did not know what had happened with Victim Four's package. KELLEY told Victim Four that their loss was their own fault because they had mailed cash.

67.    Victim Four never recovered their package or any of their cash.

### *Victim Five*

68.    Victim Five lived in Holliston, Massachusetts.

69.    In or about February 2022, a scammer who communicated with Victim Five by phone persuaded Victim Five to mail approximately $15,000 cash to an address in Las Vegas,

Nevada. Victim Five was 56 years old, disabled, and unemployed.

70.    On or about March 1, 2022, Victim Five mailed Priority Mail Express package bearing tracking number EI094617514US, which contained approximately $15,000 cash, from Holliston, Massachusetts, to an address in Las Vegas, Nevada.

71.    On or about March 2, 2022, KELLEY received a JOLT Report by automated email. The report included parcel EI094617514US, among other packages. KELLEY forwarded the report to Administrative Employee Two.

72.    On or about March 2, 2022, Administrative Employee Two emailed postal staff in Las Vegas, asking that they intercept Priority Mail Express package EI094617514US and send it to KELLEY. Unaware of KELLEY's scheme, a Las Vegas postal employee replied, "On its way."

73.    Postal staff in Las Vegas intercepted package EI094617514US, overwrapped it, and mailed it to KELLEY. The overwrapped package was delivered to DHQ on or about March 7, 2022.

74.    KELLEY opened Victim Five's package without Victim Five's consent, and stole the cash inside.

75.    Victim Five never recovered their package or any of their cash.

### *Victim Six*

76.    Victim Six lived in Fair Lawn, New Jersey.

77.    In or about February 2023, a scammer who communicated with Victim Six by phone persuaded Victim Six to mail approximately $1,400 cash to an address in Edgartown, Massachusetts. Victim Six was 82 years old and retired.

78.    On or about February 15, 2023, Victim Six mailed Priority Mail Express package

bearing tracking number EI188086165US, which contained approximately $1,400 cash, from Fair Lawn, New Jersey to an address in Edgartown, Massachusetts.

79.    On or about February 17, 2023, KELLEY received a JOLT Report by automated email. The report included parcel EI188086165US, among other packages.

80.    On or about February 17, 2023, KELLEY, now the Team Leader of the Mail Theft Unit, emailed the postmaster in Edgartown, Massachusetts, asking that they intercept Priority Mail Express package EI188086165US and send it to KELLEY. KELLEY added: "Please do NOT release information that the package was intercepted." Unaware of KELLEY's scheme, the Edgartown postmaster replied, "On its way."

81.    Postal staff in Edgartown intercepted package EI188086165US, overwrapped it, and mailed it to KELLEY. The overwrapped package was delivered to DHQ on or about February 21, 2023.

82.    KELLEY opened Victim Six's package without Victim Six's consent, and stole the cash inside.

83.    Victim Six never recovered their package or any of their cash.

### *Victim Seven*

84.    Victim Seven lived in Alva, Oklahoma.

85.    In or about April 2023, a scammer who communicated with Victim Seven by phone and email persuaded Victim Seven to mail approximately $10,800 cash to an address in Hyannis, Massachusetts. The scammer told Victim Seven to place $100 bills between pages in a book and send the book using Priority Mail Express. Victim Seven was 70 years old and about to retire.

86.    On or about April 10, 2023, Victim Seven mailed Priority Mail Express package

bearing tracking number EI442946348US, which contained approximately $10,800 in $100 bills placed between pages of a book, from Alva, Oklahoma to an address in Hyannis, Massachusetts.

87.     On or about April 11, 2023, the postmaster in Hyannis sent KELLEY an email with the subject line, "Any interest???" The text of the message was: "It feels like a book but the carrier doesn't recognize the name." The Hyannis postmaster included a photo of the package mailed by Victim Seven. The Hyannis postmaster was unaware of KELLEY's scheme.

88.     On or about April 11, 2023, KELLEY replied, "Yeah send to me…"

89.     Postal staff in Hyannis overwrapped Victim Seven's package and mailed it to KELLEY. The overwrapped package was delivered to DHQ on or about April 12, 2023.

90.     KELLEY opened Victim Seven's package without Victim Seven's consent, and stole the cash inside.

91.     Victim Seven never recovered their package or any of their cash.

### KELLEY Stole $7,000 Cash from a Vault at DHQ

*The High Value Evidence Vault*

92.     Postal Inspectors at DHQ who had custody of "high value" evidence, such as cash, were required to store it in the High Value Evidence ("HVE") vault. The HVE vault was on the sixth floor at DHQ, where all the USPIS employees, including KELLEY, had their offices.

93.     The vault was alarmed and locked. Only a few employees at DHQ, called Access Control Persons ("ACPs"), were authorized to open the vault. KELLEY was not an ACP at any time between April 2021 and January 2022.

94.     Before opening the vault, an ACP had to call downstairs to the building security office to ask them to disarm the vault. Next, the ACP unlocked the vault by (a) entering their personal numerical code on the keypad mounted next to the vault, and (b) using the combination

to the rotary combination lock attached to the vault door. To close the vault, the ACP had to relock the rotary lock and enter their personal code on the keypad. Then the ACP had to call building security and ask them to re-arm the vault.

95.     A USPIS security system automatically logged every time an ACP's keypad code was used to open or close the vault. The open/close log included the date and time when the code was used to open or close the vault, and the name of the ACP whose code was used.

96.     Inside the vault were lockers with padlocks on them. Each Postal Inspector who had property stored in the vault had an assigned locker and a key to the padlock on their locker.

97.     Only Postal Inspectors and ACPs were allowed inside the vault. An ACP was always present when a Postal Inspector was in the vault. When a Postal Inspector entered the vault, they had to print and sign their name in a logbook kept inside the vault and write down the date and times they entered and exited. The ACP signed their name next to the Inspector's signature. The Inspector and the ACP exited the vault together. Then the ACP relocked the vault and notified building security to re-arm the vault.

98.     There were only three reasons why a Postal Inspector needed to enter the vault: (a) to put high-value evidence into their locker; (b) to remove it, *e.g.*, because it was needed for trial; or (c) for their "HVE review."

99.     HVE reviews took place approximately twice a year. The purpose was to ensure that evidence in the vault was still secure, and that it was packaged and documented in accordance with USPIS rules. The reviews were conducted by supervisory Inspectors. An ACP opened the vault for the Postal Inspector and the supervisor; the Postal Inspector unlocked their locker with their key; they showed the sealed evidence bag to the supervisor; and they returned the evidence to their locker and relocked it. Evidence bags were not supposed to be opened

19

during HVE reviews.

*Inspector One Locked $322,352.72 Cash*
*in the HVE Vault on April 22, 2021*

100.    On or about April 16, 2021, Postal Inspectors and Special Agents with Internal Revenue Service-Criminal Investigation ("IRS-CI") who were assigned to a criminal investigation seized a large amount of loose cash (and a $4,000 check) while executing a search warrant at a house. The agents put the cash and check seized from the bedroom in two bags, and the cash seized from the kitchen in two other bags. Special Agents with IRS-CI transported the four sealed bags to the Stoneham, Massachusetts location of IRS-CI, and stored them in a locked safe.

101.    On or about April 22, 2021, IRS-CI Special Agents transported the four bags to the Boylston, Massachusetts branch of a cash management and vault services company (the "Security Company"), where they watched an employee use a cash-counting machine to sort and tally the bills. The cash-counting machine paused each time it finished counting 100 bills of a particular denomination. The Security Company Employee used a color-coded "strap" to band each group of 100 bills, using a different color for each denomination. They used a white strap to band any group of less than 100 bills.

102.    The cash seized from the kitchen totaled $106,337.72, and the cash seized from the bedroom totaled $216,015.00, for a grand total of $322,352.72.

103.    The banded groups of 100 bills, called "bricks," were put into two clear plastic bank bags provided by the Security Company and sealed.

    a. The bag holding the cash seized from the kitchen contained **nine bricks of $20 bills (each containing $2,000), three bricks of $50 bills (each containing $5,000)**, and several bricks of $100 bills, plus less than one hundred each of $1 bills, $5 bills, $10 bills, $20 bills, and $100 bills.

    b. The bag holding the cash seized from the bedroom contained **nine bricks of $20 bills (each containing $2,000), four bricks of $50 bills (each containing $5,000)**, and several bricks of $100 bills, plus less than one hundred each of $5 bills, $10 bills, $20 bills, and $100 bills.

104.    The agents transported the two sealed bags to DHQ to transfer custody to a Mail Fraud Postal Inspector who was assigned to the criminal investigation ("Postal Inspector One"). While en route, they called to alert Postal Inspector One that they were coming.

105.    Postal Inspector One knew that an Inspector who took custody of cash was supposed to count it with another Inspector present and document the count on a USPIS Form 717 "Currency Verification Sheet," which both Inspectors had to sign and date. Then the cash was supposed to be placed in a clear USPIS evidence bag with the completed, signed, and dated Form 717 visible inside the bag, and the bag sealed.

106.    When Postal Inspector One received the call from the IRS-CI agents, Postal Inspector One called KELLEY, their supervisor, who was not in the office. Postal Inspector One told KELLEY they were about to take custody of over $322,000 cash from IRS-CI, and that the cash had been counted by IRS-CI, not by USPIS. KELLEY told Postal Inspector One, in sum and substance, "Just put it in the vault and we'll deal with it tomorrow."

107.    The two IRS-CI agents handed the sealed bags of cash to Postal Inspector One in the presence of another Inspector. All four signed a receipt documenting the transfer of

$322,352.72 cash to the custody of Postal Inspector One.

108.    Even though Postal Inspector One knew they were supposed to count the cash, document it on a Form 717, and seal the cash and Form 717 in a USPIS evidence bag before putting the cash in the vault, Postal Inspector One did not do so because KELLEY had said to just put the cash in the vault, and KELLEY was their supervisor.

109.    An ACP ("ACP One") opened the vault and entered with Postal Inspector One, who locked the bags of cash in their locker. This was the only evidence in Postal Inspector One's locker. Postal Inspector One exited the vault with ACP One, who locked it.

110.    Even though KELLEY had told Postal Inspector One not to count the cash before putting it in the vault and "we'll deal with it tomorrow," KELLEY did not follow up.

111.    KELLEY had access to ACP One's code to the vault keypad, the vault lock combination, and Postal Inspector One's locker key.

### The Bags of Cash Were Intact
### as of September 24, 2021, at 11:53 am

112.    The next time Postal Inspector One entered the vault was the morning of September 24, 2021, for an HVE review by one of KELLEY's supervisors, an Assistant Inspector in Charge ("AIC One"). KELLEY had advance notice of this review.

113.    AIC One found that the two bags of cash in Postal Inspector One's locker were intact. AIC One noted on Postal Inspector One's HVE review report that the cash had been counted by IRS-CI. AIC One did not open the bags or recount the cash.

114.    The vault open/close log shows that the vault was closed and locked at 11:53 am.

*KELLEY Entered the HVE Vault Alone on September 24, 2021, at 2:06 pm
and Stole $7,000 of the Cash Stored in Postal Inspector One's Locker*

115.    The next entry in the vault logbook is dated September 28, 2021.

116.    However, the vault open/close log shows that ACP One's keypad code was used

on September 24, 2021, to open the vault at 2:06 pm and close it at 2:08 pm.[4]

117.    On September 24, 2021, KELLEY called building security to have the vault dis-

armed. Then he used ACP One's keypad code at 2:06 pm and the vault lock combination to open

the vault. He used Postal Inspector One's key to unlock their locker. He unsealed one of the bags

of cash and took out one brick of $50 bills ($5,000) and one brick of $20 bills ($2,000) – a total

of $7,000. Then KELLEY locked Postal Inspector One's locker, locked the combination locker

on the vault door, entered ACP One's keypad code at 2:08 pm, and called building security to re-

arm the vault.

*January 19, 2022*

118.    AIC One retired in 2021 and was replaced with an Acting Assistant Inspector in

Charge ("AIC Two").

119.    AIC Two scheduled HVE reviews for January 24, 2022.

120.    KELLEY gave Postal Inspector One at least several days' notice that he was

going to conduct an HVE review of Postal Inspector One on January 19, 2022, the purpose of

which, KELLEY said, was to count the cash in their locker before AIC Two did their review on

January 24.

121.    On January 19, 2022, the two bags of cash were removed from Postal Inspector

---

[4] This is the only discrepancy between the vault logbook and the open/close log for the entire
period between April 22, 2021, when Postal Inspector One put the bags containing $322,352.72
cash into the vault, and January 19, 2022, when the bags contained $7,000 less.

One's locker and brought to the cash-counting room, where KELLEY opened them. Counts by machine and hand showed the same total: $315,352.72 – $7,000 less than the amount contained in the sealed bags that Postal Inspector One had put in the vault. The missing $7,000 consisted of exactly 100 (one brick of) $50 bills and 100 (one brick of) $20 bills.

122.    KELLEY promptly sent a supervisor a memo entitled, "Mishandling of High Value Evidence by [Postal Inspector One]." KELLEY wrote that he had decided to count the money only *that morning*, when he allegedly learned for the first time that Postal Inspector One had never counted it. This was false. KELLEY knew from the day that Postal Inspector One took custody of the money that Postal Inspector One did not count it – *because KELLEY told them not to do so.*

123.    KELLEY's allegation was referred to the USPS Office of Inspector General for investigation. KELLEY was interviewed as part of the investigation. KELLEY again falsely stated that he decided to count the money only on the morning of January 19, 2022, and again he pretended to have learned only that morning that Postal Inspector One had not counted the cash. KELLEY blamed the count discrepancy on a possible miscount by the Security Company's cash-counting machine, and a "lapse in judgment" by Postal Inspector One in not counting the money before putting it in the vault.

124.    KELLEY deliberately and falsely blamed Postal Inspector One in order to divert attention away from himself, knowing that $7,000 cash was missing from the bags because KELLEY had stolen it.

**KELLEY Tried to Conceal the Proceeds of His Fraud Scheme
and the Cash He Stole from the HVE Vault**

*KELLEY Deposited and Spent More Than $330,000 Cash*

125.    Between on or about January 1, 2019, and on or about July 12, 2023, KELLEY

deposited and spent more than $330,000 cash.

126.    KELLEY knew there was no legitimate reason he would have this much cash. He

and his spouse received their salaries by direct deposit, and they received their other income,

including rental income from a house on Cape Cod, inheritance payments, life insurance

payments, and gifts from relatives, electronically or by check.

127.    KELLEY expended the cash in ways designed to conceal the fact that it was

illegitimate. For example, he paid approximately $158,000 cash to buy postal money orders; in

the "Payer" section of many of the money orders he wrote the names of relatives who did not, in

fact, pay for them; he structured some of his money order purchases to evade federal reporting

requirements; and he deposited some of the cash but did so over approximately sixty dates using

four different bank accounts. KELLEY also paid cash for goods and services, including a

$20,500 pool patio, $15,400 for escorts, $4,300 on cruise expenses, $4,888 for lights around his

pool and outdoor bar; $2,800 for a marble countertop for his outdoor bar; and $2,000 to heat his

pool.

*KELLEY Paid Cash for Approximately $158,540 in Postal Money Orders*

128.    Between January 9, 2019, and July 12, 2023, KELLEY paid approximately

$158,540 cash for approximately 165 postal money orders.

129.    Postal money orders could be purchased only with cash or a debit card.

130.    KELLEY deposited some of the money orders into his accounts at USAA Federal

Savings Bank and Rockland Trust.

131.    KELLEY used some of the money orders to pay bills on his credit card accounts with Barclay's Bank, Amex, and JP Morgan Chase.

*KELLEY Concealed the Fact That*
*He Was the Buyer of Many of the Money Orders*

132.    KELLEY left the "Payer" section blank, thereby concealing the fact that he was the buyer, in approximately 50 of the money orders.

133.    KELLEY wrote down false names in the "Payer" section, thereby concealing the fact that he was the buyer, in approximately 34 of the money orders. On these money orders KELLEY wrote down the names of relatives who did not, in fact, pay for them. These relatives did not know that KELLEY had identified them as the payers, nor did they give KELLEY permission to do so. The following chart summarizes these money orders, all of which KELLEY made payable to himself:

|  | Approx purchase date | MO # | Amount | Payer (as written on MO) | Deposited into |
|---|---|---|---|---|---|
| 1 | 03/27/2019 | 24501324060 | $1,000 | Relative 1 | KELLEY ck acct -0422 at USAA |
| 2 | 03/27/2019 | 24501324058 | $1,000 | Relative 1 | KELLEY ck acct -0422 at USAA |
| 3 | 08/19/2019 | 25638795167 | $1,000 | First name of Relative 2[5] | KELLEY sav acct -0414 at USAA |
| 4 | 08/19/2019 | 25638795178 | $1,000 | First name of Relative 2 | KELLEY sav acct -0414 at USAA |
| 5 | 08/28/2019 | 25586207796 | $1,000 | Relative 2 | KELLEY ck acct -0422 at USAA |
| 6 | 05/18/2020 | 25586215751 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 7 | 05/18/2020 | 25586215762 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 8 | 05/29/2020 | 26521807206 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 9 | 05/29/2020 | 26521807217 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 10 | 07/22/2020 | 26579187628 | $1,000 | Relative 2 | KELLEY ck acct -0422 at USAA |
| 11 | 07/30/2020 | 26900151153 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 12 | 10/22/2020 | 26875059041 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |

[5] Relatives 2 and 3 have the same first initial and the same last name. On some money orders KELLEY identified the alleged payer using the first initial and last name of Relatives 2 and 3. The name of the payer that KELLEY wrote on these money orders is identified on the chart as "Relative 2 or 3."

| 13 | 10/22/2020 | 26875059052 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 14 | 11/18/2020 | 26875089494 | $800 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 15 | 11/18/2020 | 26875089505 | $800 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 16 | 03/19/2021 | 25586219215 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 17 | 03/19/2021 | 25586219204 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 18 | 04/01/2021 | 26900157644 | $1,000 | Relative 2 | KELLEY ck acct -0422 at USAA |
| 19 | 04/01/2021 | 26900157655 | $1,000 | Relative 2 | KELLEY ck acct -0422 at USAA |
| 20 | 05/04/2021 | 27409375350 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 21 | 05/04/2021 | 27409375361 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 22 | 06/02/2021 | 26186723447 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 23 | 06/02/2021 | 26186723458 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 24 | 06/04/2021 | 26186723504 | $1,000 | Relative 3 | KELLEY ck acct -0422 at USAA |
| 25 | 06/04/2021 | 26186723515 | $1,000 | Relative 3 | KELLEY ck acct -0422 at USAA |
| 26 | 06/23/2021 | 27315401624 | $1,000 | Relative 3 | KELLEY ck acct -0422 at USAA |
| 27 | 07/01/2021 | 27361883193 | $1,000 | Relative 2 | KELLEY sav acct -0687 at Rockland Trust |
| 28 | 07/01/2021 | 27361883182 | $1,000 | Relative 2 | KELLEY ck acct -0422 at USAA |
| 29 | 01/04/2022 | 26808041158 | $1,000 | Relative 2 | KELLEY ck acct -0422 at USAA |
| 30 | 01/04/2022 | 26808041147 | $1,000 | Relative 2 | KELLEY ck acct -0422 at USAA |
| 31 | 04/26/2022 | 27980633957 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 32 | 02/02/2023 | 28025732092 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 33 | 02/02/2023 | 28025732103 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |
| 34 | 05/12/2023 | 28740602294 | $1,000 | Relative 2 or 3 | KELLEY ck acct -0422 at USAA |

*KELLEY Structured Some of His Money Order Purchases*
*to Evade Federal Reporting Requirements*

134.     The maximum amount of a single postal money order was $1,000. A customer

could buy multiple money orders at once. However, as KELLEY knew, the customer had to

present a photo identification and complete a PS Form 8105-A, Funds Transaction Report

("FTR"), if the total amount purchased at a single post office in a single day was $3,000 or more.

This was a requirement under the federal Bank Secrecy Act and related anti-money laundering

regulations.

135.     KELLEY always bought less than $3,000 in money orders from a single post

office on a single day.

136.     As KELLEY knew, the FTR requirement also applied if a customer bought a total

of $3,000 or more in money orders from more than one post office on the same day. However, because a postal employee would not necessarily know that a customer buying a money order had already bought money orders at another post office on the same day, a postal employee was required to have a customer complete the FTR only if the postal employee "knows or has reason to believe that multiple purchases are being made." PS Form 8105-A.

137.    On the following dates KELLEY bought $3,000 or more in total money orders but went to two different post offices in Massachusetts, buying less than $3,000 at each. KELLEY did so to evade federal reporting requirements:

| Approx purchase date | Post office location where purchased | MO # | Amount |
|---|---|---|---|
| 01/09/2018 | Bryantville | 24373777735 | $1,000 |
| | Bryantville | 24373777746 | $1,000 |
| | Bryantville | 24373777757 | $500 |
| | Kingston | 24634834367 | $1,000 |
| | Kingston | 24634834378 | $1,000 |
| | Kingston | 24634834380 | $500 |
| 05/15/2018 | Pembroke | 23705811426 | $1,000 |
| | Pembroke | 23705811437 | $1,000 |
| | Pembroke | 23705811448 | $200 |
| | Hanover | 24501315216 | $700 |
| | Hanover | 24501315227 | $700 |
| | Hanover | 24501315238 | $800 |
| 10/19/2018 | Pembroke | 23705815601 | $1,000 |
| | Pembroke | 23705815612 | $1,000 |
| | Hanover | 24501320190 | $750 |
| | Hanover | 24501320201 | $750 |
| 08/12/2019 | Plymouth | 25902239602 | $1,000 |
| | Plymouth | 25902239613 | $1,000 |
| | Kingston | 24634846978 | $1,000 |
| | Kingston | 24634846980 | $1,000 |
| 09/06/2019 | Bryantville | 24373782516 | $1,000 |
| | Bryantville | 24373782505 | $1,000 |
| | East Bridgewater | 25859478576 | $1,000 |
| | East Bridgewater | 25859478587 | $1,000 |
| 01/15/2020 | Brockton | 26306428882 | $1,000 |
| | Brockton | 26306428893 | $1,000 |
| | Whitman | 26103498941 | $700 |
| | Whitman | 26103498928 | $1,000 |
| 05/04/2021 | Hanover | 25586219597 | $1,000 |
| | Hanover | 25586219608 | $1,000 |
| | Boston (Fort Point) | 27409375350 | $1,000 |
| | Boston (Fort Point) | 27409375361 | $1,000 |

*KELLEY Deposited Over $130,000 Cash*

138.    Between January 8, 2019, and July 12, 2023, KELLEY deposited approximately

$131,470 cash. KELLEY did so in ways to avoid bank suspicion. For example, he deposited the

cash on approximately sixty different dates, in four different bank accounts at two banks

(Rockland Trust account nos. -4860, -0687, and -8210; and Hanscom Federal Credit Union

account no. -6240), with no deposit exceeding $4,800.[6]

*KELLEY Paid $20,500 Cash for a Pool Patio*

139.    On or before October 18, 2021, KELLEY emailed a company referred to herein as the "Concrete Company" asking for a quote for a stamped concrete patio for a pool that he was planning to have installed at his home in Pembroke, Massachusetts.

140.    On or about October 18, 2021, the Concrete Company emailed KELLEY a quote for the patio.

141.    On or about November 30, 2021, KELLEY signed a $20,700 contract with the Concrete Company for a 1,300-square-foot stamped concrete pool patio.

142.    On or about January 19, 2022, KELLEY paid the Concrete Company a $1,000 deposit by personal check.

143.    On or about March 19, 2022, KELLEY emailed the Concrete Company that his pool was going to be installed in late April.

144.    On or about June 11, 2022, KELLEY paid the Concrete Company $8,000 cash.

145.    Between on or about June 11, 2022, and on or about June 22, 2022, KELLEY paid the Concrete Company $5,000 cash.

146.    On or about June 22, 2022, KELLEY gave $7,500 cash to the Concrete Company workers finishing his patio, and emailed the Concrete Company, "Just wanted to make sure you received the money. We are paid in full."

147.    In total, KELLEY paid the Concrete Company approximately $20,500 cash

---

[6] As KELLEY knew, banks have to report any single cash deposit over $10,000 to the federal government. This is a requirement under the federal Bank Secrecy Act and related anti-money laundering regulations.

between June 11 and June 22, 2022. The completed patio is shown in this photo:



*KELLEY Paid $15,400 Cash to Two Escorts*

148.    Calling himself "Sean Stone," KELLEY paid two escorts cash in exchange for sexual services.

149.    KELLEY texted with Escort One using a burner phone.

150.    Their texts included the following exchange on Wednesday, October 6, 2021, a workday:



151.    KELLEY met Escort One in various locations in and around Boston on or about

the following eight workdays, paying cash in the following approximate amounts totaling

$5,650:

| Approximate Date | | Approximate Amount |
| --- | --- | --- |
| Wednesday | 04/07/21 | $600 |
| Wednesday | 10/06/21 | $600 |
| Friday | 01/21/22 | $600 |
| Wednesday | 03/09/22 | $600 |
| Tuesday | 08/30/22 | $700 |
| Tuesday | 09/13/22 | $850 |
| Thursday | 01/05/23 | $850 |
| Monday | 05/01/23 | $850 |

152.    KELLEY texted with Escort Two using a burner phone. Their texts included the

following exchange on Wednesday, October 26, 2022, a workday:



153.    KELLEY met Escort Two in Boston on or about the following twelve workdays, and paid cash in the following approximate amounts totaling $9,750:

| Approximate Date | | Approximate Amount |
|---|---|---|
| Tuesday | 09/06/22 | $800 |
| Wednesday | 10/26/22 | $700 |
| Thursday | 12/01/22 | $750 |
| Wednesday | 01/11/23 | $800 |
| Wednesday | 01/18/23 | $800 |
| Tuesday | 02/28/23 | $800 |
| Tuesday | 03/14/23 | $800 |
| Tuesday | 04/04/23 | $1,100 |
| Thursday | 04/13/23 | $800 |
| Tuesday | 05/23/23 | $800 |
| Thursday | 06/22/23 | $800 |
| Monday | 07/10/23 | $800 |

154.    KELLEY paid Escort One and Escort Two a total of approximately $15,400 cash between on or about April 7, 2021, and on or about July 10, 2023.

*KELLEY Paid $4,888 to Install Lighting for His Pool and Outdoor Bar*

155.    In or about June 2022, KELLEY paid an electrical contracting firm approximately $3,178 cash to install landscape lights around KELLEY's pool, and lights in and around KELLEY's pool shed.

156.    In or about August 2022, KELLEY paid the electrical contracting firm approximately $1,710 cash to install lighting and an electrical supply line for KELLEY's outdoor bar.

157.    KELLEY paid the electrical contracting firm a total of approximately $4,888 cash between approximately June 2022 and approximately August 2022.

*KELLEY Paid $4,800 Cash for a Marble Countertop*
*for His Outdoor Bar and to Heat His Pool*

158.    Between on or about January 19, 2022, and on or about May 18, 2022, KELLEY paid a marble and granite company approximately $2,800 cash to install a granite countertop on

KELLEY's outdoor bar. The countertop is shown in this photo:



159.    On or about June 15, 2022, KELLEY paid a plumbing company approximately $2,000 cash to install an underground gas line from the gas meter to the pool heater at KELLEY's home in Pembroke, Massachusetts.

*KELLEY Paid $4,300 Cash Toward Expenses Incurred on Cruises*

160.    KELLEY and his family went on a Caribbean cruise in or about March 2020. On or about March 13, 2020, KELLEY paid approximately $1,800 cash toward bar drinks and other expenses incurred during the cruise.

161.    KELLEY and his family went on a Caribbean cruise in or about March-April 2022. On or about April 2, 2022, KELLEY paid approximately $1,000 cash toward bar drinks and other expenses incurred during the cruise.

162.    KELLEY and his family went on a Caribbean cruise in or about April 2023. On or about April 23, 2023, KELLEY paid approximately $1,500 cash toward bar drinks and other expenses incurred during the cruise.

163.    In summary, between January 8, 2019, and July 12, 2023, KELLEY spent

approximately $339,898.16 in cash, as follows:

|  | MOs | Cash deposits | Pool patio | Escorts | Pool & bar lighting | Countertop & gas line | Cruises | Total |
|---|---|---|---|---|---|---|---|---|
| 2019 | $34,600 | $21,993.64 | n/a | n/a | n/a | n/a | n/a | $56,593.64 |
| 2020 | $45,400 | $27,967.42 | n/a | n/a | n/a | n/a | $1,800 | $75,167.42 |
| 2021 | $40,000 | $19,600.00 | n/a | $1,200 | n/a | n/a | n/a | $60,800.00 |
| 2022 | $18,540 | $46,272.10 | $20,500 | $5,000 | $4,888 | $4,800 | $1,000 | $101,000.10 |
| 2023 | $20,000 | $15,637.00 | n/a | $9,200 | n/a | n/a | $1,500 | $46,337.00 |
| Total | $158,540 | $131,470.16 | $20,500 | $15,400 | $4,888 | $4,800 | $4,300 | $339,898.16 |

## KELLEY Failed to Report the Stolen Cash on His Federal Tax Returns

164.    KELLEY was required to report the cash he stole to the IRS. He did not do so.

165.    For calendar years 2019 – 2023, KELLEY and his spouse filed joint Form 1040

federal income tax returns reporting only their Form W-2 wages, dividend income, taxable

interest, and rental income. The reported income amounts were:

| 2019 | $170,340 |
|---|---|
| 2020 | $186,124 |
| 2021 | $190,854 |
| 2022 | $215,381 |
| 2023 | $237,226 |
| Total | $999,925 |

166.    As noted above, KELLEY spent and deposited no less than $339,898.16 cash

between January 8, 2019, and July 12, 2023:

| 2019 | $56,593.64 |
|---|---|
| 2020 | $75,167.42 |
| 2021 | $60,800.00 |
| 2022 | $101,000.10 |
| 2023 | $46,337.00 |
| Total | $339,898.16 |

167.    Even assuming that some of KELLEY's cash purchases were made with

legitimate cash, *i.e.*, cash that KELLEY and his spouse paid taxes on and reported to the IRS,

and withdrew from ATMs and bank tellers, KELLEY still underreported his income by at least the following amounts:

| | |
|---|---|
| 2019 | $45,624.69 |
| 2020 | $74,950.97 |
| 2021 | $59,730.25 |
| 2022 | $98,399.60 |
| 2023 | $38,015.50 |
| Total | $316,721.01 |

COUNTS ONE - FIVE
Wire Fraud
(18 U.S.C. § 1343)

The Grand Jury charges:

168.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-167 of this

Indictment.

169.    On or about the dates below, in the District of Massachusetts, and elsewhere, the

defendant,

SCOTT KELLEY,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money

and property by means of materially false and fraudulent pretenses, representations, and promises,

did transmit and cause to be transmitted by means of wire communications in interstate and foreign

commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme

to defraud, as set forth below:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| 1 | May 11, 2021 | Email from Administrative Employee One to the Postmaster in Hyannis, MA, asking that they intercept Priority Mail Express package EJ608818052US (mailed by Victim Three) and send it to KELLEY. This email traveled through a server in Minnesota. |
| 2 | Jan. 3, 2022 | Email from Administrative Employee Two to postal staff in Checotah, OK, asking that they intercept Priority Mail Express package EJ833357790US (mailed by Victim Four) and send it to KELLEY. |
| 3 | Mar. 2, 2022 | Email from Administrative Employee Two to postal staff in Las Vegas, NV, asking that they intercept Priority Mail Express package EI094617514US (mailed by Victim Five) and send it to KELLEY. |
| 4 | Feb. 17, 2023 | Email from the Postmaster in Edgartown, MA to KELLEY, saying, "On its way," in response to KELLEY's request that Priority Mail Express package EI188086165US (mailed by Victim Six) be intercepted and sent to KELLEY. This email traveled through servers in Iowa and the Philippines. |
| 5 | Apr. 11, 2023 | Email from the Postmaster in Hyannis, MA to KELLEY asking whether KELLEY had "[a]ny interest" in Priority Mail Express package EI442946348US (mailed by Victim Seven), to which KELLEY replied, "Yeah send to me…" The Postmaster's email traveled through servers in Iowa and the Philippines. |

All in violation of Title 18, United States Code, Section 1343.

COUNTS SIX - TEN
Mail Fraud
(18 U.S.C. § 1341)

The Grand Jury further charges:

170.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-167 of this

Indictment.

171.    On or about the dates below, in the District of Massachusetts, and elsewhere, the

defendant,

SCOTT KELLEY,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money

and property by means of materially false and fraudulent pretenses, representations, and promises,

did, for the purpose of executing and attempting to execute the scheme, knowingly cause to be

delivered by mail and by any private and commercial interstate carrier according to the direction

thereon, the following:

| Count | Approximate Date | Mailing |
|-------|-----------------|---------|
| 6 | May 12, 2021 | Delivery to DHQ of overwrapped package containing Priority Mail Express package EJ608818052US (mailed by Victim Three) |
| 7 | Jan. 6, 2022 | Delivery to DHQ of overwrapped package containing Priority Mail Express package EJ833357790US (mailed by Victim Four) |
| 8 | Mar. 7, 2022 | Delivery to DHQ of overwrapped package containing Priority Mail Express package EI094617514US (mailed by Victim Five) |
| 9 | Feb. 18, 2023 | Delivery to DHQ of overwrapped package containing Priority Mail Express package EI188086165US (mailed by Victim Six) |
| 10 | Apr. 12, 2023 | Delivery to DHQ of overwrapped package containing Priority Mail Express package EI442946348US (mailed by Victim Seven) |

All in violation of Title 18, United States Code, Section 1341.

COUNTS ELEVEN - FIFTEEN
Theft of Mail by Postal Officer
(18 U.S.C. § 1709)

The Grand Jury further charges:

172.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-167 of this

Indictment.

173.     On or about the dates below, in the District of Massachusetts, and elsewhere, the

defendant,

SCOTT KELLEY,

being a Postal Service officer and employee, did steal, abstract, and remove from a package which

had come into his possession intended to be conveyed by mail, and forwarded through and

delivered from any post office and station thereof established by authority of the Postmaster

General and of the Postal Service, the following:

| Count | Approximate Date | Mailing |
|-------|------------------|---------|
| 11 | May 14, 2021 | Approximately $2,000 cash contained in Priority Mail Express package EJ608818052US (mailed by Victim Three) |
| 12 | Jan. 6, 2022 | Approximately $5,400 cash contained in Priority Mail Express package EJ833357790US (mailed by Victim Four) |
| 13 | Mar. 7, 2022 | Approximately $15,000 cash contained in Priority Mail Express package EI094617514US (mailed by Victim Five) |
| 14 | Feb. 21, 2023 | Approximately $1,400 cash contained in Priority Mail Express package EI188086165US (mailed by Victim Six) |
| 15 | Apr. 12, 2023 | Approximately $10,800 cash contained in Priority Mail Express package EI442946348US (mailed by Victim Seven) |

All in violation of Title 18, United States Code, Section 1709.

40

COUNT SIXTEEN
Theft of Government Money
(18 U.S.C. § 641)

The Grand Jury further charges:

174.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-167 of this Indictment.

175.    On or about September 24, 2021, in the District of Massachusetts, and elsewhere, the defendant,

SCOTT KELLEY,

did knowingly and willfully embezzle, steal, purloin, and convert to his use and the use of another, any money and thing of value of the United States and of any department and agency thereof, in a total amount greater than $1,000, namely, cash having a value of approximately $7,000.

All in violation of Title 18, United States Code, Section 641.

COUNTS SEVENTEEN – THIRTY-NINE
Money Laundering
(18 U.S.C. § 1956(a)(1)(B)(i))

The Grand Jury further charges:

176.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-167 of this

Indictment.

177.    On or about the dates below, in the District of Massachusetts, and elsewhere, the

defendant,

SCOTT KELLEY,

conducted and attempted to conduct the financial transactions described below, knowing that the

property involved in such transactions represented the proceeds of some form of unlawful activity,

and which in fact involved the proceeds of specified unlawful activity, that is, wire fraud and mail

fraud, in violation of Title 18, Sections 1341 and 1343, and knowing that the transactions were

designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and

control of the proceeds of specified unlawful activity.

| Count | Approx Date | Financial Transaction |
|-------|-------------|----------------------|
| 17 | 10/22/2020 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #26875059041 for $1,000, with payer falsely identified as Relative 2 or Relative 3 |
| 18 | 10/22/2020 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #26875059052 for $1,000, with payer falsely identified as Relative 2 or Relative 3 |
| 19 | 11/18/2020 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #26875089494 for $800, with payer falsely identified as Relative 2 or Relative 3 |
| 20 | 11/18/2020 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #26875089505 for $800, with payer falsely identified as Relative 2 or Relative 3 |
| 21 | 03/19/2021 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #25586219215 for $1,000, with payer falsely identified as Relative 2 or Relative 3 |

| 22 | 03/19/2021 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #25586219204 for $1,000, with payer falsely identified as Relative 2 or Relative 3 |
| 23 | 04/01/2021 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #26900157644 for $1,000, with payer falsely identified as Relative 2 |
| 24 | 04/01/2021 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #26900157655 for $1,000, with payer falsely identified as Relative 2 |
| 25 | 05/10/2021 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #27409375350 for $1,000, with payer falsely identified as Relative 2 or Relative 3 |
| 26 | 05/10/2021 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #27409375361 for $1,000, with payer falsely identified as Relative 2 or Relative 3 |
| 27 | 06/04/2021 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #26186723447 for $1,000, with payer falsely identified as Relative 2 or Relative 3 |
| 28 | 06/04/2021 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #26186723458 for $1,000, with payer falsely identified as Relative 2 or Relative 3 |
| 29 | 06/08/2021 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #26186723504 for $1,000, with payer falsely identified as Relative 3 |
| 30 | 06/08/2021 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #26186723515 for $1,000, with payer falsely identified as Relative 3 |
| 31 | 06/29/2021 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #27315401624 for $1,000, with payer falsely identified as Relative 3 |
| 32 | 07/06/2021 | Deposit into KELLEY's savings acct -0687 at Rockland Trust of postal money order #27361883193 for $1,000, with payer falsely identified as Relative 2 |
| 33 | 07/06/2021 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #27361883182 for $1,000, with payer falsely identified as Relative 2 |
| 34 | 01/05/2022 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #26808041158 for $1,000, with payer falsely identified as Relative 2 |
| 35 | 01/05/2022 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #26808041147 for $1,000, with payer falsely identified as Relative 2 |
| 36 | 04/26/2022 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #27980633957 for $1,000, with payer falsely identified as Relative 2 or Relative 3 |
| 37 | 02/02/2023 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #28025732092 for $1,000, with payer falsely identified as Relative 2 or Relative 3 |
| 38 | 02/02/2023 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #28025732103 for $1,000, with payer falsely identified as Relative 2 or Relative 3 |
| 39 | 05/12/2023 | Deposit into KELLEY's checking acct -0422 at USAA Federal Savings Bank of postal money order #28740602294 for $1,000, with payer falsely identified as Relative 2 or Relative 3 |

All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

<u>COUNT FORTY</u>
Structuring to Evade Reporting Requirements
(31 U.S.C. § 5324(a)(3))

The Grand Jury further charges:

178.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-167 of this Indictment.

179.    On or about the date below, in the District of Massachusetts, and elsewhere, the defendant,

SCOTT KELLEY,

for the purpose of evading the currency transaction reporting requirements imposed upon domestic financial institutions, and while violating another law of the United States, did knowingly structure, attempt to structure, and assist in structuring his transactions with one or more domestic financial institutions by engaging in the following financial transaction:

| Count | Approx Date | Transaction |
|-------|-------------|-------------|
| 40 | May 4, 2021 | KELLEY's purchase of two $1,000 postal money orders (nos. 25586219597 and 25586219608) at a post office in Hanover, MA, and two $1,000 postal money orders (nos. 27409375350 and 27409375361) at a post office in Boston, MA |

All in violation of Title 31, United States Code, Section 5324(a)(3) and (d)(2).

44

<u>COUNTS FORTY-ONE – FORTY-FIVE</u>
Filing False Tax Returns
(26 U.S.C. § 7206(1))

The Grand Jury further charges:

180.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-167 of this Indictment.

181.    On or about the dates below, in the District of Massachusetts, and elsewhere, the defendant,

SCOTT KELLEY,

did willfully make and subscribe a U.S. Individual Tax Return, Form 1040, for the calendar years set forth below, each of which was verified by a written declaration that it was made under penalties of perjury and was filed with the Internal Revenue Service, and each of which the defendant did not believe to be true and correct as to every material matter in that each return understated defendant's total income, as a result of which each return understated the amount of taxes due and owing for that year.

| Count | Calendar Year | Approximate Filing Date |
|-------|---------------|-------------------------|
| 41 | 2019 | March 29, 2020 |
| 42 | 2020 | May 4, 2021 |
| 43 | 2021 | April 11, 2022 |
| 44 | 2022 | April 12, 2023 |
| 45 | 2023 | April 13, 2024 |

All in violation of Title 26, United States Code, Section 7206(1).

45

## WIRE AND MAIL FRAUD FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

1.    Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Section 1343, or Title 18, United States Code, Section 1341, set forth in Counts One through Five, and Six through Ten, respectively, the defendant,

SCOTT KELLEY,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

2.    If any of the property described in Paragraph 1, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating 21 United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

46

## THEFT OF GOVERNMENT MONEY FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The Grand Jury further finds:

1.      Upon conviction of the offense in violation of Title 18, United States Code,

Section 641, set forth in Count Sixteen, the defendant,

SCOTT KELLEY,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C)

and Title 28, United States Code, Section 2461(c), any property, real or personal, which

constitutes or is derived from proceeds traceable to the offense. The property to be forfeited

includes, but is not limited to, the following asset:

a.   $7,000 to be entered in the form of a forfeiture money judgment.

2.      If any of the property described in Paragraph 1, above, as being forfeitable

pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code,

Section 2461(c), as a result of any act or omission of the defendant --

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without
difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant up to the value of the property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

## MONEY LAUNDERING FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(1))

1.    Upon conviction of one or more of the offenses in violation of Title 18, United

States Code, Section 1956, set forth in Counts Seventeen through Thirty-Nine, the defendant,

SCOTT KELLEY,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any

property, real or personal, involved in such offenses, and any property traceable to such property.

2.    If any of the property described in Paragraph 1, above, as being forfeitable

pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of

the defendant --

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without
       difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section

982(a)(1), incorporating Title 18, United States Code, Section 853(p), to seek forfeiture of any

other property of the defendant up to the value of the property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Section 982(a)(1).

## STRUCTURING FORFEITURE ALLEGATION
### (31 U.S.C. § 5317(c)(1))

1.    Upon conviction of the offense in violation of Title 31, United States Code,

section 5324 set forth in Count Forty, the defendant,

SCOTT KELLEY,

shall forfeit to the United States, pursuant to Title 31, United States Code, Section 5317(c)(1)(A),

all property, real or personal, involved in the offense(s) and any property traceable to such

property.

2.    If any of the property described in Paragraph 1, above, as being forfeitable

pursuant Title 31, United States Code, Section 5317(c)(1)(A), as a result of any act or omission

of the defendant:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided

         without difficulty,

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p),

as incorporated by Title 31, United States Code, Section 5317(c)(1)(B), to seek forfeiture of any

other property of the defendant up to the value of the property described in Paragraph 1 above.

All pursuant to Title 31, United States Code, Section 5317(1).

A TRUE BILL

_____
FOREPERSON

_____
CHRISTINE WICHERS
DUSTIN CHAO
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: AUGUST 28, 2025
Returned into the District Court by the Grand Jurors and filed.

/s/ Noreen A. Russo
_____
DEPUTY CLERK    at 4:25 PM