| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| V. ) | Crim. No. 25-cr-10355-ADB |
| ) | |
| SCOTT KELLEY ) | |

**DEFENDANT'S MOTION TO COMPEL DISCOVERY**

The defendant, Scott Kelley, moves this Court to order the government to produce the following requested discovery. As grounds, Mr. Kelley states that the requested information is material and relevant to the preparation of his defense, and that he cannot properly prepare for trial without access to it.

**CASE BACKGROUND**

Mr. Kelley is a former U.S. Postal Inspector in the Boston Division Headquarters for the U.S. Postal Inspector Services ("USPIS"). From approximately 2015 to 2022, he was the team leader of the Mail Fraud and Money Laundering Investigations Unit ("Mail Fraud Unit"), where he supervised, investigated, and prevented fraud schemes that used the mail. From 2022 until 2023, Mr. Kelley was team leader of the Mail Theft, Robbery, and Security Investigations at USPIS. Mr. Kelley retired from USPIS in 2024.

On August 28, 2025, the government charged Mr. Kelley in a 45-count indictment with the following: wire fraud (counts 1-5), mail fraud (counts 6-10), mail theft by postal inspector (counts 11-15), theft of government money (count 16), money laundering (counts 17-39), structuring to evade reporting requirements (count 40), and filing false tax returns (counts 41-45).

The conduct at issue falls into essentially two categories. First, the government alleges that Mr. Kelley intercepted packages containing cash and stole the money within. The packages were affiliated with USPIS's investigation into Jamaican Operations Linked to Telemarketing ("JOLT") scams. JOLT scams targeted primarily elderly individuals. In essence, a scammer contacts the target victim, informs the target that they won the lottery or some other prize (e.g., cash, a car, or a TV), and persuades the target to send cash through the mail to collect the prize. The scammer falsely claims that the target must pay cash upfront to cover "fees" or "taxes" before the scammer will send the much the larger – and nonexistent – prize to the target.

The government alleges that Mr. Kelley intercepted these packages in his capacity as a Postal Inspector, stole the money within the packages, and attempted to disguise these unlawful proceeds by (i) not reporting the proceeds from this unlawful scheme as "income" on his taxes, (ii) paying for home improvements and other goods or services primarily in cash, (iii) making several large cash deposits into his bank accounts below the $10,000 threshold to avoid detection, and (iv) purchasing large numbers of money orders to then deposit in his bank account. Per the government, the money orders were purchased in a way to avoid reporting requirements and falsely listed various relatives as the "payor." [1] Further, the government alleges that Mr. Kelley's intercepting these packages when he was team leader of the Mail Theft Unit (2022 – 2023) was beyond the scope of his duties, as JOLT scams were not an investigative or crime-preventive task under his umbrella.

---

[1] An individual may purchase two money orders, $1000 apiece, from a post office or bank without showing identification on the same day. If a person purchases three or more money orders in a single location at the same time, the bank or post office requires identification and records the transaction. Mr. Kelley is accused purchasing hundreds of money orders, and occasionally purchasing two at one location (e.g., at the post office in Boston), and then two more the same day in a different location, all to avoid detection.

The government identified approximately $330,000 in unexplained deposits and spending among Mr. Kelley's bank statements and accounts between 2019 and 2023, including payments for services, cash deposits, and money orders. The government maintains that these unexplained funds reflect that Mr. Kelley embezzled currency that he pilfered from JOLT-affiliated packages. Yet, the government has only been able to identify seven alleged victims. The total cash proceeds alleged to have been lost by these seven individuals amount to $61,200 – several $100,000 short of what the government asserts Mr. Kelley stole.

Through counsel, Mr. Kelley requested that the government identify each package or person, beyond the previously identified seven in the indictment, that Mr. Kelley is alleged to have taken and the amounts therein. The government responded, "It is impossible for the government to identify every package that Mr. Kelley intercepted." Gov't Response to Defense Discovery Request # 1 (Feb. 5, 2026). There is a yawning gap – in excess of a quarter million dollars – between the amount of unlawful proceeds the government accuses Mr. Kelley of pilfering, laundering, and failing to report on his taxes (in excess of $330,000) versus the amount actually lost by any identifiable victim ($61,200). Further, there is scant corroborating evidence to tie Mr. Kelley to any additional package thefts. The main link to Mr. Kelley is that these seven packages, like 100s of others during this period, were marked for interception by Mr. Kelley or his employees.

The second category of conduct at issue is Mr. Kelley's allegedly stealing $7,000 from USPIS's High Value Evidence Vault ("HVE Vault") on September 24, 2021. The HVE Vault is centrally located in a sixth floor suite at department headquarters in the Barnes Building in Boston. To enter, an individual manually writes down their entry time into a logbook. Then, the individual has to call downstairs to the building's security office to request that the vault be

disarmed. Next, an authorized control person – at this time, an administrative employee – must enter their personal numerical code on the keypad and use a rotary combination keypad mount on the vault door to open the outer vault door. Within the vault, agents have padlocked lockers, which contain high value evidence, such as cash. Only the agent and an office administrator (not Mr. Kelley) had copies of the key. To close the vault, first a person would have to reattach the padlock to their locker, then the authorized control person had to relock the rotary lock and enter their personal code on the keypad. Finally, the authorized control person had to call down to the building's security to ask them to re-arm the vault. A computer-generated log tracks when the vault is opened and closed. The agent similarly manually logs their exit time from the vault in the handwritten logbook. USPIS employees must enter the vault two at a time, including the authorized control person. Mr. Kelley was not an authorized control person at USPIS in 2021.

The government alleges, in count 16 of the indictment, that Mr. Kelley entered the HVE Vault undetected from 2:06 PM to 2:08 PM on September 24, 2021 and that he took $7,000 out of an evidence bag. The evidence bag was locked within Agent Ryan Noonan's ("Agent Noonan") locker. In support of this contention, the government emphasizes that there is only one discrepancy between the manually-entered (i.e., handwritten) HVE Vault logbook, and the computer-generated log of entry and exits into and out of the HVE Vault. That lone discrepancy occurred between 2:06 and 2:08 PM on September 24, 2021.

For the government's theory to be true, Mr. Kelley would have had to accomplish the following during this two-minute window: (i) call down to building security to request they disarm the vault, (ii) enter a rotary combination with an access code Mr. Kelley did not possess, (iii) enter a keypad combination that he did not have, (iv) unlock Agent Noonan's locker within the vault by using a key Mr. Kelley did not have, (v) open one of two possible evidence bags

containing anywhere between approximately $318,000 to $322,000 (reports at the time of conflict[2]), (vi) steal $7,000 in cash, (vii) reseal the evidence bag(s), (viii) relock Agent Noonan's padlocked locker, (ix) close the vault door, (x) re-enter the rotary combination (which he did not have) to secure the vault, (xi) re-enter the authorized control person's code (again, a code he did not possess), and (xii) call down to security to request that the vault be rearmed. Per the government, Mr. Kelley pulled off this heist undetected in the middle of the afternoon, after lunch, on a workday in the middle of the sixth-floor suite.

Belying the government's narrative is that there is no security guard who recalls speaking with Mr. Kelley on September 24, 2021, no eyewitness to Mr. Kelley's ingress and egress, no surveillance footage of the incident, no fingerprints or DNA recovered from the evidence bag, and the cash was never recovered. Further, the only authorized control person the government interviewed – to counsel's knowledge – advised that she kept the detailed instructions with the rotary combination as well as her credentials to enter the HVE Vault locked away inside her desk. There is also no evidence to suggest that Mr. Kelley had a copy of Mr. Noonan's padlock key or (a different) administrator's duplicate copy, which, presumably, was also kept under lock and key.

Mr. Kelley is the one who reported the missing funds in the HVE Vault to the Office of Inspector General ("OIG") in January 2022, when he was conducting a high value evidence review of the HVE Vault with his employees. He observed the unkempt evidence bags which

---

[2] Based on the discovery produced, there are several discrepancies between the amount of money related to the initial deposit of these funds into the HVE Vault. While the government places that amount at approximately $322,000, records from the time of USPIS's receipt of the funds suggest the amount of currency may have totaled approximately $318,000, plus an additional $4,000 check. During the IRS's own count of the funds on the date of seizure and prior to USPIS's receiving funds, the initial count differed from the subsequent count by over $10,000.

were missing proper paperwork on their exterior, USPIS evidence tape, and other requirements under the relevant protocols. Mr. Kelley memorialized his discovery, sat for interviews with OIG, and assisted in OIG's Special Inquiries Division's independent investigation, which closed on February 7, 2022. During this investigation, Agent Noonan admitted to mishandling the funds, not filling out any currency transaction reports or related paperwork, and miscounting the money at the time the funds were initially received (by him and Agent Kelly McKiernan) at USPIS on April 21, 2021.

The government has produced no evidence that Mr. Kelley was even working anywhere near department headquarters on September 24, 2021. In fact, that morning, Mr. Kelley returned from Florida after a four-day vacation with his wife, as well as USPS OIG Special Agent Mark Aldoupolis and his wife.[3] Their flight from Tampa landed at Logan Airport at approximately 10:50 AM on September 24, 2021. Mr. Kelley drove himself, his wife, Special Agent Aldoupolis, and Special Agent Aldoupolis's wife back to their respective homes in Pembroke, MA after he picked up his car from the garage.

**REQUESTED DISCOVERY**

On February 5, 2026, undersigned counsel sent a letter to the government requesting discovery, which is appended as Exhibit 1. The government responded that evening, and then sent a correction the following day, February 6, 2026, both of which are appended as Exhibit 2. The government agreed to turn over some, but not all, of the requested discovery. On February 11, 2026, the government produced the discovery to which it had agreed. Through counsel, Mr.

---

[3] Counsel noticed, pursuant Fed. R. Crim. P. 12.1(a), a defense of alibi to Count 16 (Theft of Government Property).

Kelley now moves this Court to order the government to furnish the following specific items of discovery:

- **Defense Request # 2**: Defense requested that the government produce in original format the Prohibited Mail Database – Narcotics ("PMD-N database"), which USPIS used to track intercepted packages related to the JOLT scam from 2015 to 2023. This database may be titled, either formally or informally, as the JOLT Database or the JOLT Case Management Database. Ex. 1, Request 2.

    Gov't's response: "The requested database is not discoverable under Fed. R. Crim. P. 16 or Local Rules 116.1(c), 116.2."

- **Defense Request # 4**: Defense requested, in part, Agent Ryan Noonan's personnel file.

    Gov't's response: "The government has not located a personnel file of Ryan Noonan kept by Mr. Kelley."

- **Defense Request # 5**: Defense requested, in part, Agent Kelly McKiernan's personnel file.

    **Gov't's response**: "The government has not located a personnel file of Kelly McKiernan Noonan kept by Mr. Kelley."

- **Defense Request # 10**: Please provide any reports or HVE reviews in which other evidence and/or funds were suspected missing, miscounted, or required further intervention following a HVE review from 2015 to 2023

    **Govt's response**: "The requested documents are not discoverable under Fed. R. Crim. P. 16 or Local Rules 116.1(c), 116.2."

- **Defense Request #16**: All reports from the Office of Inspector General related to the investigation into Mr. Kelley.

    **Govt's response**: "The requested documents are not discoverable under Fed. R. Crim. P. 16 or Local Rules 116.1(c), 116.2."

- **Defense Request # 17**: Please provide and any all correspondence, statements, or reports regarding Inspector Ryan Noonan related to the HVE Vault. Please provide the financial disclosures, or any other financial documents in law enforcement's possession, custody, and control regarding Ryan Noonan. Such evidence should include OGE Form 450, confidential financial disclosure reports, from 2019 through 2023.

    **Govt's response**: "The requested documents are not discoverable under Fed. R. Crim. P. 16 or Local Rules 116.1(c), 116.2."

- **Defense Request # 18**: Please provide and any all correspondence regarding Inspector Kelly McKiernan. Please provide the financial disclosures, or any other financial documents in law enforcement's possession, custody, and control regarding Kelly McKiernan. Such evidence should include OGE Form 450, confidential financial disclosure reports, from 2019 through 2023.

     **Govt's response**: "The requested documents are not discoverable under Fed. R. Crim. P. 16 or Local Rules 116.1(c), 116.2."

- **Defense Request # 20**: Please provide any and all reports by Special Agent Kin Yuen related to his investigation in this matter. If Special Agent Yuen did not author the report but was present for the interview, investigative activity, or other relevant investigative matter, please identify the author of the report and furnish a copy of the report and/or document.

     **Govt's response**: "The requested documents are not discoverable under Fed. R. Crim. P. 16 or Local Rules 116.1(c), 116.2."

- **Defense Request # 21**: Please provide the upwards of 150 subpoenas for records that were issued during this investigation.

     **Govt's response**: "The requested documents are not discoverable under Fed. R. Crim. P. 16 or Local Rules 116.1(c), 116.2."

## ARGUMENT

Federal Rule of Criminal Procedure 16 provides that upon a defendant's request, the government must permit the defendant to inspect and copy evidence in its possession so long as it is material to preparing the defense. Fed. R. Crim. P. 16(a)(1)(E)(i). A showing of materiality requires an indication that disclosure of the information sought would allow the defendant to significantly alter the quantum of proof in his favor. *United States v. Goris*, 876 F.3d 40, 45 (1st Cir. 2017), citing *United States v. Ross*, 511 F.2d 757, 763 (5th Cir. 1975). This indication may take many forms such as "uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993).

Further, Local Rule 116.2(b)(1) provides that any evidence that casts doubt on a defendant's guilt as to any essential element in any count in the indictment, or casts doubt on the credibility or accuracy of any evidence that the government anticipates using in its case-in-chief must be turned over within the same time period of automatic discovery under Local Rule 116.1(c)(1).

**I.      Defense Request # 2 (JOLT Database) is material and relevant to preparing Mr. Kelley's defense and should be produced.**

The JOLT Database is part of the internal records of USPIS. Mr. Kelley received a printout of suspected JOLT packages each morning. He directly, or through an administrative employee, Tom Lyons, sought to intercept suspected JOLT packages by e-mailing the local post offices where the package was located. USPIS did not track suspected JOLT packages that Mr. Kelley requested to intercept versus those that actually arrived at Department Headquarters. For example, in the search warrant affidavit filed by the government, Special Agent Ken Yuen noted, "From 2019-2023, KELLEY requested approximately 743 packages be intercepted and delivered to his attention, but only approximately 212 were properly documented and recorded in the U.S. Postal Service's case management system." BATES Stamp USAO-SK-00016818. At the time, USPIS OIG had only "identified at least four packages from mail fraud victims containing cash that Kelley requested and were delivered to Kelley, but those packages were never recorded in" USPIS's record management system, recovered, or returned to sender. *Id.* Often, the local post office did not receive the request to intercept in time, as the package had already been mailed to the sender.

When a suspected JOLT package arrived at headquarters, it would be placed into a designated JOLT cubby where administrative employees, including, but not limited to Kimberly Scimemi, Norma Torres, or Joe Burke, entered the package into the Prohibited Mail Narcotics

9

Database ("PMN Database"). The database tracked all prohibited mail, including narcotics. Within the database, there was a dropdown menu where the user could designate the package as "JOLT." The case management entries included a JOLT intake form, the date the package was received at USPIS HQ, the sender's and recipient's names, package tracking information, and the disposition of the package (i.e., return to sender). The package would then be overwrapped, assigned a tracking number, and returned to the sender, along with a preprinted form from Mr. Kelley that alerted the sender that the sender was suspected to be the victim of a scam as well as a word of caution on sending money through the mail.

Through counsel, Mr. Kelley requested that the government provide a copy of or access to the PMN database related to JOLT investigations from 2015 to 2023. Based on information and belief, the database contains information on the seven alleged victims that might exculpate Mr. Kelley by reflecting whether or not their package ever came to the 6th floor where Mr. Kelley's office was located, and whether it was entered into the JOLT Database by an administrative employee. If any of the seven packages came to the 6th floor and were properly entered into the database, this would suggest the package was returned but not received. It would also belie the notion that Mr. Kelley was secreting the packages, taking the money within, and then destroying the evidence of the package, as the government implicitly contends. If, on the other hand, any of the seven packages identified by the government are not located in the JOLT Database, it suggests either that the package never arrived at Department Headquarters, or that it was intercepted by a third party culprit before it reached the 6th floor. Either way, the evidence is exculpatory and casts doubt on counts 1-15, 17-39, and 41-45.

Equally as important, the database will reflect that Mr. Kelley continued to intercept JOLT packages in both 2022 and 2023. The government alleges, in part, Mr. Kelley acted

beyond the scope of his station when he sought to intercept packages after he became team leader of the Mail Theft Unit in 2022 through 2023. In essence, the government contends that, as the team leader of the Mail Theft Unit, he was no longer responsible for JOLT scam investigations or preventive crime measures. Indictment at ¶ 6 ("The Mail Theft Unit did not investigate mail fraud scams.").

Upon information and belief, Mr. Kelley continued with JOLT interceptions with the explicit blessing of his superiors, tracked and intercepted suspected JOLT packages, and directed that they be entered into the JOLT database while he was team leader of the Mail Theft Unit from 2022-2023. His openly tracking and reporting JOLT packages into the JOLT Database during this time period tends to disprove the government's theory that Mr. Kelley was deceptive or that he attempted to shield his JOLT-related interceptions from discovery by higher ups while he was team leader of the Mail Theft Unit.

Because the requested discovery is material and necessary to prepare Mr. Kelley's defense, this Court should order the government to furnish it in discovery or provide access to such evidence well in advance of trial to allow Mr. Kelley to timely prepare, and if necessary, notice aspects of this defense, including witnesses, as is required by the rules.

## II.  Defense Request #'s 4, 5, 10, 17, 18.

All of these requests pertain to the HVE Vault and Agents Noonan and McKiernan's involvement in the receipt and disposition of approximately $322,000 in April 2021, of which Mr. Kelley is alleged to have stolen $7,000 on or about September 24, 2021. Agents Noonan and McKiernan initially received the funds from the IRS in April 2021. Despite explicit protocols governing the receipt of such funds, they did not fill out and attach Form 717s (Currency Verification Forms) to the exterior of the evidence bags, did not fill out Property Evidence

Acquisition Program ("PEAP) forms with corresponding bar codes in each evidence bag, did not affix USPIS evidence tape at the top of the sealed bags, and did not initial or date the sealing tape or any other location on the evidence bag. The government tries to explain away their failure to follow protocol with Agent Noonan's asserting – several years after the fact – that Mr. Kelley advised him, "Just put it in the vault and we'll deal with it tomorrow." ECF # 1 (Indictment at ¶ 106).

Nowhere in Agent Noonan's characterization does he explain that Mr. Kelley directed him **not** to follow evidence receipt protocols, or that Mr. Kelley had instructed the same to Agent McKiernan, who was equally bound to follow these evidentiary protocols. More troublingly, the government is talking out of both sides of its mouth. The government claims the funds were intact on the morning of September 24, 2021 because another supervising agent, Special Agent Ray Moss, conducted an HVE Vault Review that day and found nothing amiss. Indictment at ¶¶ 112-114. The next HVE Vault Review by Mr. Kelley in January 2022 led to the discovery of the improper paperwork and, ultimately, missing money, which Mr. Kelley reported to OIG.

The government cannot have it both ways. If Agents Noonan and McKiernan failed to fill out the proper paperwork and affix it to the evidence bags on April 21, 2021 because Mr. Kelley directed them to "just put it in the vault," then the HVE Vault Review by Special Agent Moss was incompetently performed and is unreliable. He failed to see the lack of proper forms, tape, initials, and documentation, all of which would have been clearly visible on the bag's exterior. If that scenario were true, the government's theory on when and how the money was stolen based on its last being intact does not hold up to scrutiny. *See* Indictment at ¶¶ 112-114 (section titled, "The Bags of Cash were Intact as Of September 24, 2021 at 11:53 AM).

Alternatively, if, as the government contends, Special Agent Moss's HVE Vault Review was correctly performed, accurate, and reliable, then Agents Noonan and McKiernan did fill out the paperwork properly when they received the funds – despite Mr. Kelley's telling them to "just put it [the funds] in the vault," – and affixed it to the evidence bag's exterior. If that were the case, the government's theory about Mr. Kelley's knowledge of the improperly handled evidence cannot be true. *See* Indictment at ¶ 122 ("Kelley knew from the day that [Agent Noonan] took custody of the money that [Agent Noonan] did not count it – ***because Kelley told them [Noonan and McKiernan] not to do so***.") (emphasis in original). Both of these scenarios cannot be true.

Further muddying the waters is that both Agents Noonan and McKiernan admitted that they mishandled this evidence and improperly counted the funds on or about February 10, 2022 in memorialized meetings with their supervisor, Mr. Kelley. Nowhere did they assert in defense of their incompetence that the reason they failed to follow protocol was because Mr. Kelley directed them not to count it or that the money must have been pilfered.

The most plausible reason money was missing was either Agent Noonan or McKiernan stole it at inception, or, they mishandled the funds. Regardless, their personnel files (Defense Request #'s 4 and 5), prior HVE Vault reviews in which money was found missing or mishandled (Defense Request # 10), correspondence, statements, or reports by or about Agents Noonan and/or McKiernan regarding the government's investigation into the missing funds, including their OGE Form 450s and financial disclosures from 2021 (Defense Request #'s 17 and 18) are relevant and material.

The disclosure of such information sought would allow the defendant to significantly alter the quantum of proof in his favor, *Goris*, 876 F.3d at 45, by providing evidence of third party culprits, or, alternatively, further evidence of bureaucratic incompetence that led to the

miscounting and mishandling of these funds for which Mr. Kelly should not be blamed. As such, this Court should order that this evidence be disclosed to the defense.

**III.**     **<u>Defense Request #16 (all reports from the Office of Inspector General related to the investigation into Mr. Kelley), 20 (reports by or involving Special Agent Kin Yuen), 21 (150 subpoenas for records).</u>**

The government dumped terabytes of data on defense counsel. This includes seizures of three iCloud e-mail accounts, several cellphone forensic extractions, and three external hard drives, which are so large, counsel cannot save to his firm's server, per his IT department. Much of this discovery fails to illuminate the evidence that the government will seek to admit at trial. Based on the discovery produced thus far, upwards of 35 witnesses testified during the grand jury presentation and over 150 subpoenas for records were returned.

As to the records from the Office of Inspector General ("OIG"), OIG handled several portions of this investigation. It initially investigated the HVE Vault funds in 2022, per Mr. Kelley's referral. It closed the investigation with no further action in 2022, before resuscitating it some two years later to pin the blame on Mr. Kelley. OIG applied for over a dozen warrants, interviewed multiple victims, and combed through voluminous records. These warrants were authored by Special Agent Yuen.

Counsel seeks to avoid a trial by ambush and an unnecessary delay in trial proceedings where the government turns over all Jenck's Act materials after the witness finishes direct examination, or, under our local rules, 21 days before trial is to commence. Given the sheer volume of discovery produced thus far, another massive data dump on the eve of trial would needlessly delay trial and adversely affect Mr. Kelley's ability to meaningfully prepare a defense. As such, Mr. Kelley moves this Court to order the government to produce the requested discovery.

14

SCOTT KELLEY
By his attorneys,
CARNEY, GAUDET & CARNEY

*Nat Carney*

Nat Carney
B.B.O. # 709020

*Daniel J. Gaudet*

Daniel J. Gaudet
B.B.O. # 688120


20 Park Plaza, Suite 614
Boston, MA 02116
617-933-0350
NCarney@CARNEYdefense.com

March 3, 2026


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on or before the above date.


*Nat Carney*

Nat Carney

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | Crim. No. 25-cr-10355-ADB |
| | ) | |
| SCOTT KELLEY | ) | |
| | ) | |

## AFFIDAVIT SUPPORTING DEFENDANT'S MOTION TO COMPEL DISCOVERY

I, Nat Carney, state that the facts contained in the attached motion are true to the best of my current information, knowledge, and belief.

Signed under the penalties of perjury

*Nat Carney*

Nat Carney

March 3, 2026

1