UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SCOTT KELLEY,<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>) | No. 25-cr-10355-ADB |

**UNITED STATES' SENTENCING MEMORANDUM**

**INTRODUCTION**

Scott Kelley was a supervisory Postal Inspector, a sworn federal law enforcement officer. He was trusted and empowered to protect the vulnerable from mail fraud scams. He abused that power and trust, stealing over $340,000 in cash from senior citizens and other vulnerable victims across the country. He spent or kept all of the cash, using much of it to pay personal credit card bills; outfit his pool with a patio, granite bar countertops, and new lights; hire prostitutes; and pay bar tabs while on Caribbean cruises with his family.

Why did he do it? Greed, coupled with a sense of impunity.

How did he do it? By using his position as the Postal Inspector in charge of the Mail Fraud Unit, and his knowledge of criminal investigative techniques learned on the job, to devise a scheme he believed would be undetectable. He believed no one would question his requests to intercept parcels mailed by suspected scam victims because everyone would assume that he was doing so to return the contents to the senders. He knew that few victims would file complaints with USPS, for reasons including embarrassment, denial, a belief that a complaint would be futile, lack of wherewithal, or even, in some cases, dementia. Kelley knew from experience that reports of

missing parcels eventually would be treated as lost mail. He knew it was hard for law enforcement to trace cash payments—and he made it even harder by keeping each of his payments relatively small. He paid credit card bills with money orders to conceal the fact that he was using cash. He hid the fact that he was depositing large amounts of cash by using multiple accounts at different banks, spreading his deposits out over time, and never depositing an amount that would have required the bank to report the deposit to federal regulators. He concealed the fact that he used cash to buy over 160 postal money orders by writing family members' names on the "payor" line, and always buying less than the amount that would have triggered a requirement that Kelley present identification documentation.

Kelley's criminal scheme succeeded for about eight years. It was brought to a halt only because of the persistence and dogged efforts of a seventy-eight-year-old widow who refused to give up and refused to be intimidated, even as Kelley berated her in her own home. Her insistence to see justice be done was the mirror opposite of Kelley's insistence to enrich himself—and is what brought Kelley's criminal conduct to light.

Section 3553(a) directs the Court to craft a sentence that reflects the seriousness of the offenses, promotes respect for the law, and justly punishes Kelley. That sentence must adequately deter those in positions of trust tempted to similar betrayals. And it dictates that the sentence must protect the public—exactly what Kelley failed to do.

To accomplish these goals, and consistent with its commitments in the Plea Agreement, the United States recommends the Court impose a sentence of forty-six months incarceration, thirty-six months of supervised release, a fine of $20,000, restitution in the amount of $35,170 to Victims 9-13 as further described below, restitution to the IRS in the amount of $71,816 with an

additional payment of $7,051 as a condition of supervised release, and a $4,400 mandatory special assessment.[1]

## FACTUAL BACKGROUND

### I. The Defendant

From 2007 until 2023, Kelley was a Postal Inspector with the United States Postal Inspection Service ("USPIS")—the law enforcement, crime prevention, and security arm of the U.S. Postal Service. (PSR ¶ 13.) As a Postal Inspector, Kelley was entrusted with federal law enforcement; he wore a badge, carried a gun, made arrests, and worked together with federal prosecutors bringing cases before this Court and others. (PSR ¶ 14.) In 2015, Kelley became Team Leader of the Mail Fraud Unit, the team tasked with investigating mail fraud scams. (PSR ¶¶ 17, 18.) In 2022, Kelley was involuntarily transferred to the Mail Theft Unit, which had no purview over mail fraud. He remained there until placed on administrative leave on August 11, 2023. (PSR ¶¶ 13 n.2, 26).

### II. The JOLT Program

Mail fraud scams that target the elderly are uniquely predatory and pernicious. They target victims with false promises of sweepstakes or lottery winnings. Posing as lottery representatives, the scammers contact elderly persons and other vulnerable individuals and persuade them to pay "fees" or "taxes" as a prerequisite for receiving their "winnings" or "prize." Victims often do mail these funds, including large sums of cash, which the scammers keep. The victims not only lose their money but feel confused and ashamed.

[1] The Court has already entered a $341,898 Money Judgment Order of Forfeiture against Kelley. Dkt. No. 75.

After discovering that a disproportionate number of these scams were originating from Jamaica, USPIS worked with Jamaican law enforcement to institute a nationwide initiative to disrupt these scams called Jamaican Operations Linked to Telemarketing, *i.e.,* "JOLT." (PSR ¶ 18.) The JOLT Program was exclusively managed by the Mail Fraud Unit. (*Id.*)

One of the primary ways the JOLT program disrupted mail fraud scams was to identify suspicious packages in the U.S. mail stream—for example, packages *en route* to addresses that had received victims' packages before—and intercept them before delivery for return to the victim. As the Team Leader of the Mail Fraud Unit from 2015 to June 2022, Kelley was aware that packages flagged by JOLT often contained cash, sometimes in substantial amounts. In December 2018, for example, Kelley learned that an Inspector on his team had recovered $30,000 in cash from a single JOLT package.

### III. Kelley's Theft of Mail and Cash

By no later than 2016, Kelley began directing employees on the Mail Fraud Team to intercept JOLT-identified packages and re-route them to him directly at Boston Division Headquarters ("DHQ"), 495 Summer Street, Boston—a secure federal building known as the Barnes Building, where Kelley worked. (PSR ¶ 20.) He did so for the ostensible purpose of legitimate investigative work. It was then that Kelley's thefts began.

Specifically, Kelley began identifying packages via periodic "Automatic Mail Watch Reports" which alerted him to Priority Mail or Priority Mail Express packages addressed to Massachusetts addresses that were flagged by the JOLT Program. (PSR ¶ 21.) Separately, Postal Inspectors in other jurisdictions, as well as local police departments—knowing Kelley's dogged interest in JOLT packages—would periodically alert him to flagged mail with a nexus to

Massachusetts. Kelley took pains to be a clearinghouse for JOLT intercepts—for example, in 2017, by emailing USPIS employees in Florida and Chicago and directing them to send all JOLT related information to him directly, and not to another Inspector. (PSR ¶¶ 21, 22.)

In 2018—in addition to continuing to receive and act upon *ad hoc* JOLT tips—Kelley began systematizing his efforts. (PSR ¶ 23.) On or about September 11, 2018, he directed an employee on his team ("Administrative Employee 1" in the Indictment) to review lists of JOLT packages twice a day to identify JOLT packages coming to or from Massachusetts, and (if possible) to have them mailed to Kelley directly. (*Id.*) Administrative Employee 1 performed this task daily. (*Id.*) After Administrative Employee 1's retirement on November 5, 2021, this task fell to another employee on Kelley's team ("Administrative Employee 2" in the Indictment). (PSR ¶ 25.)

In May 2019, Kelley began receiving a daily nationwide "JOLT Report," an Excel spreadsheet tracking all Priority Mail and Priority Mail Express packages in the U.S. mail stream flagged by the JOLT program. (PSR ¶ 24.) Every day he emailed the JOLT Report to Administrative Employee 1 and then 2—always with the direction that Massachusetts-related packages be re-directed to him. (PSR ¶ 25.) After Kelley was involuntarily transferred to the Mail Theft Unit on June 18, 2022—and was thus divested of responsibility for the JOLT program—he nonetheless continued to intercept JOLT packages. Unable to use employees within the Mail Fraud Unit, he simply did so himself, omitting from his signature block the fact that he was no longer in Mail Fraud. (PSR ¶ 26.)

As a result of these efforts, Kelley received *hundreds* of JOLT packages at the Barnes Building. He inspected them to assess whether they likely contained cash. If they did, he opened

the parcels and stole any cash inside. If they did not, Kelley either assigned the parcels to Inspectors on his team or directed that the parcels be returned to the senders. (PSR ¶ 20.)

***

It is impossible to know exactly how many packages Kelley stole. (PSR ¶ 30.) He did not keep a log and there were no cameras outside his office. (*Id.*) He knew that missing packages would simply be deemed lost.

Altogether, however, Kelley either sent an intercept request himself, or Administrative Employees 1 and 2 copied Kelley on intercept requests, corresponding to approximately **1,950 packages** from 2019 to 2023. (PSR ¶ 27.) This number is conservative. It does not include: (a) packages intercepted from 2016-2018; (b) intercept requests which may have inadvertently failed to copy Kelley; and (c) packages sent to Kelley by unwitting Postal employees who knew Kelley wanted all packages sent by probable scam victims (*e.g.*, Victim 7's package, which the Hyannis Postmaster—unprompted—intercepted and mailed to Kelley). (PSR ¶ 27 & n.5.)

The exact number of packages delivered to Kelley and not returned to the senders is impossible to determine. USPIS, however, has analyzed tracking data and determined that **hundreds** of packages were intercepted from the mail stream, sent to Kelley's attention at the Barnes Building, and never seen again. (PSR ¶ 27.)

### IV. Sample Victims

The Indictment identifies seven victims; on July 20, 2026, the Government disclosed one more. Together, these are Victims 1-8. Kelley has paid restitution to these victims totaling $62,000.

The Government has since identified 5 additional victims. These are Victims 9-13. The

Government alleges—and Probation concurs—that Kelley should be ordered to pay restitution to Victims 9-13 as well.

Six victims have provided written or video-recorded impact statements to the Court, either directly or through surviving family. Two other victims will address the Court directly. Those statements speak with more force and clarity than what the Government can offer. A summary of their background and loss—which Kelley did not contest in his objections to the PSR—follows. *See also* PSR ¶¶ 37-68.

A. Victim 1 (PSR ¶¶ 37-38)

Victim 1 is a retired Army veteran living in Kansas. He worked as a long-haul truck driver for 44 years. In 2019, Victim 1 was 76 years old. On June 24, 2019, at the direction of a scammer, Victim 1 mailed $19,100 in cash to an address in Centerville, Massachusetts. On June 25, 2019, Victim 1's package appeared on the daily JOLT Report. It was intercepted at Kelley's request and arrived addressed to his attention at the Barnes Building on June 26, 2019. It was never returned.

On several occasions, postal employees emailed Kelley to explain that Victim 1 was looking for his missing parcel. This included a July 2, 2019, email from Consumer Affairs stating: "Please assist with a package that was intercepted by USPIS. Customer is upset and would like to know who has his package." Each time, Kelley falsely reported that he had spoken with Victim 1 and that the package had been returned to him. In one email, Kelley wrote: "I spoke w sender 3 times today … close out."

Victim 1 will address the Court in person at the sentencing.

B. Victim 2 (PSR ¶ 39)

Victim 2 was a retired construction supervisor living in Mississippi. In 2020, Victim 2 was 82 years old. On July 28, 2020, at the direction of a scammer, Victim 2 sent $7,500 in cash to an address in Lowell, Massachusetts. On July 29, 2020, Victim 2's package appeared on the daily JOLT Report. It was intercepted at Kelley's request and arrived at the Barnes Building addressed to his attention on August 4, 2020. It was never returned.

A couple of weeks later, when Victim 2 did not receive any lottery winnings, he told his daughter-in-law what had happened. On August 24, 2020, she called the Lowell post office, but by then Kelley had the parcel. On November 13, 2020, she again called the Lowell post office. The Lowell Postmaster then emailed Kelley: "The daughter [sic] of this elderly man sent cash to this [address] in Lowell with no return address. Is this one you intercepted?" Kelley did not reply.

Victim 2 died in August 2025. Victim 2's daughter-in-law has recorded a statement which the Government will play at sentencing.

C. Victim 3 (Counts 1, 6, and 11) (PSR ¶ 42)

Victim 3 lives with her husband, an Army veteran who served in Korea, in Indiana. When their five children were young, Victim 3 cared for them while her husband worked the swing shift at a natural gas company; in turn, her husband cared for them while Victim 3 cleaned houses and offices. In 2021, Victim 3 was 78 and her husband was 82.

On May 10, 2021, at the direction of a scammer, Victim 3 sent $2,000 in cash to an address in Hyannis, Massachusetts. On May 11, 2021, Victim 3's package appeared on the daily JOLT Report. It was intercepted at Kelley's request and arrived at the Barnes Building addressed to his attention on May 14, 2021. It was never returned.

Victim 3 and her husband filed a police report. Nothing happened. Victim 3 has recorded a video statement which the Government will play at the sentencing.

D. Victim 4 (Counts 2, 7 and 12) (PSR ¶ 44-51)

Victim 4 is a retired nurse who suffers from Parkinson's Disease. She lives with her son in Waltham, Massachusetts. In 2021, she was 78 years old.

On December 30, 2021, at the direction of a scammer, Victim 4 mailed $5,400 in cash to an address in Checotah, Oklahoma. On January 3, 2022, Victim 4's package appeared on the daily JOLT Report. It was intercepted at Kelley's request and arrived at the Barnes Building on January 6, 2022. It was never returned.

On January 3, 2022, Victim 4 realized she had been scammed and returned to the Waltham post office, where she spoke with the supervisor. The supervisor followed up with many calls to Kelley, who denied knowing where Victim 4's parcel was—even though the supervisor saw in the Postal Tracking System that the parcel had been delivered to the Barnes Building. In their final call, Kelley told the supervisor: "If you call me again, I'm going to have your fucking job." He threatened to call her manager.

Victim 4 enlisted the help of Waltham Police Officer Jon Bailey, who worked on elder abuse cases. On July 7, 2022, Officer Bailey submitted Victim 4's information to one of Kelley's direct reports, who in turn forwarded it to Kelley. Kelley did nothing.

Victim 4 did not give up. She wrote a letter accusing USPS of stealing her money. She sent it to numerous parties, including WBZ-TV. On November 2, 2022, a reporter with WBZ-TV emailed USPS to say she was writing a story on Victim 4. The email made its way to another of Kelley's supervisee Inspectors, who followed up with Kelley. Kelley sent a false and

misleading reply email: "Unfortunately, as you know this happens often, we are not even sure where the package ended up or if it was delivered. I have spoken w so many people regarding packages etc we don't know if they are victims or scammers. As you know the package is NOT guaranteed intercept. We returned probably 400 packages to victims etc in any given year."

Under pressure, Kelley agreed to meet Victim 4 at her home on November 16, 2022. Nervous, Victim 4 asked Officer Bailey to attend the meeting. When Victim 4 asked Kelley why he was finally talking to her after failing to return her calls for almost a year, he said: "Because WBZ notified the Post Office." Kelley blamed Victim 4 for the lost parcel. He said it was her fault because she should not have mailed cash. He also questioned why it took her six months to file a police report. Officer Bailey reported that Kelley was unprofessional and rude. The meeting ended with Kelley saying he would talk to a friend at a detective agency and would call Victim 4 back after Thanksgiving. He never contacted Victim 4 again.

On November 21, 2022, Kelley was asked by his manager if there was any more information on Victim 4's lost parcel. Kelley replied: "I went out and met w the woman last week. She is a victim of some type of Romance Scam…she stated the package was delivered to our office. I have no records of the package being entered into the PMN database. … I actually was going to Upload the police report she filed and refer to the OIG [USPS Office of Inspector General]. She thinks we have her package…. Honestly, don't recall all the packages when they come in they go to [name of USPIS administrative employee] for entry into JOLT database they returned to sender." The supervisor told Kelley to refer the matter to OIG. Kelley then emailed a referral to OIG falsely stating that USPIS had never received Victim 4's parcel.

On March 9, 2023, a manager in USPS Customer Relations emailed Kelley to explain that

Senator Ed Markey had sent a congressional inquiry about Victim 4's missing parcel. Kelley falsely replied: "This package was attempted to be intercepted due to being tracked from overseas. This is a common scam. I believe we attempted to intercept though the package was never received here in Boston Inspection Service for an unknown reason. The signature is not from a USPIS employee. I have met w victim and told her the case was referred to the OIG hotline. Unfortunately, we intercept hundreds of scam packages every [sic] and return money to victims."

Victim 4's efforts brought Kelley's conduct to light. Victim 4 has recorded a video statement which the Government will play at the sentencing.

E. Victim 5 (Counts 3, 8, and 13) (PSR ¶ 52-53)

Victim 5 is a resident of Holliston, MA. In 2022, she was unemployed, having been laid off from BJ's Wholesale Club after 31 years. She suffers numerous ailments and receives disability benefits. In 2022, she was 59 years old.

On March 1, 2022, at the direction of a scammer, Victim 5 mailed $15,000 in cash to Las Vegas. On March 2, 2022, Victim 5's package appeared on the daily JOLT Report. It was intercepted at Kelley's direction and arrived at the Barnes Building addressed to his attention on March 7, 2022. It was never returned. Victim 4 called the USPS complaint hotline. She was told the package was either lost or stolen in transit.

Victim 5 will address the Court in person at sentencing.

F. Victim 6 (Counts 4, 9, and 14) (PSR ¶¶ 54-54)

Victim 6 was an apartment building manager. In 2023, he was 83 years old and widowed. He lived in New Jersey. On February 15, 2023, at the direction of a scammer, Victim 6 mailed $1,400 in cash to an address in Edgartown, Massachusetts. On February 17, 2023, Victim 6's

parcel appeared on the daily JOLT Report. Kelley—now in the Mail Theft Unit—directly emailed postal staff in Edgartown, instructed that the package be intercepted, and ordered: "Please do NOT release information that the package was intercepted." On February 21, Victim 6's package arrived at the Barnes Building. It was never returned.

Victim 6 died earlier this year.

G. Victim 7 (Counts 5, 10, and 15) (PSR ¶¶ 56-57)

Victim 7 worked in a nursing home for 53 years, first as a dishwasher and later as a nurse's aide. She lives in Oklahoma. She suffers from numerous health issues. In 2023, Victim 7 was 70 years old.

In 2023, a scammer told Victim 7 that she had won the "Mega Millions" and a car. The scammer told Victim 7 that she would receive a check for $15,000. He told Victim 7 to deposit the check, keep $4,000 for herself, withdraw the remaining $11,000 in $100 bills, place the bills inside a book, wrap the book in wrapping paper, and mail it to an address in Hyannis.

On April 7, 2023, Victim 7 received the $15,00 check—undoubtedly from another victim. She deposited the check into her bank account. Her pre-deposit balance was $36.37.

On April 10, 2023, Victim 7 did as she was told. She withdrew $11,000 in $100 bills. She used one $100 bill to buy a book, wrapping paper, and tape; and a second $100 to pay for postage. She put the remaining $10,800 in the book, wrapped it, and mailed it as instructed.

On April 11, 2023, Victim 7's package arrived at the post office in Hyannis. Staff there—who understood Kelley was keen to intercept packages, ostensibly to return to victims—flagged the package and wrote to Kelley: "Any interest??? It feels like a book but the carrier doesn't recognize the name." He replied: "Yeah send to me."

On April 12, 2023, Victim 7's package arrived at the Barnes Building. It was never returned.

On April 11, 2023, the $15,000 check sent to Victim 7 bounced. The bank helped Victim 7 file a police report. Victim 7 has recorded a video statement which the Government will play at the sentencing.

H. Victim 8 (PSR ¶ 59)

Victim 8 works as a care provider in an assisted living facility for $12 an hour. She lives in Ohio. In 2022, she was 70 years old and recently widowed. On September 21, 2022, at the direction of a scammer, Victim 8 sent $800 in cash to an address in S. Yarmouth, MA. On September 22, 2022, Victim 8's package appeared on the daily JOLT Report. Kelley emailed postal staff in S. Yarmouth asking that the package be intercepted. It was—and arrived at the Barnes Building on September 23, 2023. It was never returned.

I. Victim 9 (PSR ¶¶ 60-61)

In 2021, Victim 9 was 85 years old and recently widowed. She lives in Kentucky. On September 8, 2021, at the direction of a scammer, Victim 9 sent $3,000 in cash to an address in Hyannis, Massachusetts. On September 8, 2021, Victim 9's package appeared on the daily JOLT Report. It was intercepted at Kelley's direction and mailed to Kelley that same day. It was never returned. Victim 9 had to take out a loan to cover expenses.

On September 8, 2021, Victim 9 filed a complaint with USPS about the missing parcel, identifying the $3,000 inside. This complaint was forwarded to Kelley on September 9, 2021. The Government alleges that Kelley stole this $3,000 from Victim 9.

J. Victim 10 (PSR ¶¶ 62-63)

In 2021, Victim 10 was 86 years old and living in Washington state. On November 16, 2021, Victim 10 sent $6,000 in cash to an address in Hyannis. He had obtained that cash by taking out a loan secured by his car. On November 18, 2021, Victim 10's parcel appeared on the daily JOLT Report. It was intercepted at Kelley's direction, and arrived at the Barnes Building on November 19, 2021. It was never returned.

On November 22, 2021, Victim 10 filed a complaint with USPS stating that his parcel had not been delivered and asking that an investigation be opened. The addressee also filed a complaint stating he had not received the parcel. On November 23, 2021, the Hyannis Supervisor of Customer Services emailed Kelley: "Just in case you're curious the sender and the receiver [filed complaints with USPS] and are claiming we stole it." Kelley did not reply.

The Government alleges that Kelley stole this $6,000 from Victim 10.

K. Victim 11 (PSR ¶ 64)

In 2022, Victim 11 was 73 years old. Previously homeless, she was living with her brother in Hawaii. On February 23, 2022, Victim 11 sent $670 cash to an address in Nantucket, Massachusetts. On February 24, Victim 11's package appeared on the daily JOLT Report. It was intercepted at Kelley's direction, and arrived at the Barnes Building on March 2, 2022. It was never returned. The Government alleges that Kelley stole this $670 from Victim 11.

L. Victim 12 (PSR ¶¶ 65-66)

In 2022, Victim 12 was 87 years old. On February 23, 2022, Victim 12 mailed $1,000 in $100 bills to an address in Marstons Mills, Massachusetts. On February 24, 2022, Victim 12's parcel appeared on the daily JOLT Report. It was intercepted at Kelley's direction and arrived at

the Barnes Building on February 25, 2022. It was never returned. The Government alleges that Kelley stole this $1,000 from Victim 12.

Victim 12 passed away on January 28. His son has written a statement which has been submitted to the Court.

M. Victim 13 (PSR ¶¶ 67-68)

In 2023, Victim 13 was 76 years old. On July 6, 2023, Victim 13 sent $24,500 cash from Westport, Massachusetts, to an address in Alabama. On July 7, 2023, Victim 13's package appeared on the daily JOLT Report. Kelley emailed the post office in Alabama: "Please do NOT release information that the package was intercepted. This is NON-Mailable and will be RTS [returned to sender]." Victim 13's package arrived at the Barnes Building on July 10, 2023. It was never returned. The Government alleges that Kelley stole this $24,500 from Victim 13.

Victim 13 passed away on May 12, 2026. His daughter has written a statement which has been submitted to the Court.

***

These thirteen victims are samples of a much broader whole. Kelley stole hundreds of such packages. Each represents a story just like these.

## V. Kelley's Cash Expenditures

As noted in the PSR, it is impossible to know exactly how much cash Kelley stole. (PSR ¶ 69). There were no cameras in or outside his office, and he did not keep a log (that the Government knows of).

In such a case, it is appropriate to "use the gain that resulted from the offense." USSG § 2B1.1(b)(1)(B). To reach a conservative estimate of that gain, the Government has identified

Kelley's cash deposits and cash payments for various services during the time frame he admits he was stealing cash from packages. Between January 1, 2019, and August 11, 2023—Kelley's last day in the office—Kelley spent and deposited $341,898 in cash. This is a conservative minimum dollar amount of stolen cash. (*Id.*) These expenditures and deposits are detailed in Paragraphs 69-77 (and summarized in Paragraph 80) in the PSR. Kelley did not object to those paragraphs and thus admits the following:

*Cash deposits*. Between January 8, 2019, and June 27, 2023, Kelley deposited $131,470 in cash in four different accounts at two banks. He did so in a manner to avoid suspicion, making deposits on approximately 60 different days with no deposit exceeding $4,800.

*Money orders*. Between January 2019 and August 11, 2023, Kelley used cash to purchase $160,540 in postal money orders. For several, he falsely identified the payor as one of his family members—either one of his half-brothers, his mother, his wife, or his mother-in-law. He structured these money orders deliberately to avoid reporting triggers which he knew about, including that purchasing $3,000 or more in money orders in one day requires the buyer to produce personal identification information.

*Sex workers.* Using a burner phone and a false name, Kelley solicited sex work—but only from prostitutes who accepted cash. For example, when one woman wrote that she accepted only gift cards, Kelley responded, "only cash sorry." When another woman texted that she accepted only stream gift cards, CashApp, and PayPal, Kelley replied, "Not interested just cash." Kelley replied, "Bye just cash" to another woman's text saying she accepted only Zelle and CashApp.

Kelley found two prostitutes who did accept cash. He paid one a total of $5,650 between April 7, 2021, and May 1, 2023, in amounts ranging from $600 to $850. He paid the other a total

of $9,750 between September 6, 2022, and July 10, 2023, in amounts ranging from $700 to $1,100. Kelley always met these women during workdays.

*Cash Purchases*. Kelley paid cash for the following:

- $20,500 for a patio around his backyard pool (2022);
- $2,800 for a granite countertop for his outdoor bar (2022);
- $4,888 for lights around his pool and outdoor bar (2022);
- $2,000 for the installation of an underground gas line from his gas meter to his pool heater (2022); and
- $4,300 to cover expenses, mostly bar tabs, during Caribbean cruises with his family in 2020, 2022, and 2023.

### VI. Kelley's Admissions

On July 29, 2026, Kelley pleaded guilty to 44 counts in the Indictment. The hearing transcript is attached as Exhibit 1. Kelley was placed under oath. The Government was asked to summarize his conduct. The Court specifically instructed Kelley to "listen carefully, because when [the Government] is done, I'm going to turn back to you and ask if you disagree with anything she said." Tr. at 22:8-11. Kelley replied: "Yes, Your Honor." *Id.* at 22:12.

The Government averred, *inter alia*:

- "[T]he defendant used his position as the head of the Mail Fraud Team to intercept parcels listed on the JOLT report and have them sent to him ostensibly as legitimate investigative work. Every day the defendant received the JOLT report and forwarded it to a support staff person in his office" and "[e]very day the defendant told [support staff] to identify the parcels on the JOLT report that were heading to or from a

Massachusetts address and try to have those parcels intercepted and sent to the defendant at the sixth floor of the Barnes Building in Boston where he and the rest of the Boston division headquarters worked." *Id.* at 24:12-25.

- "In June of 2022, the defendant was transferred to the Mail Theft Unit. Because the Mail Theft Unit did not work on the JOLT program, the defendant knew that if he asked support staff to intercept JOLT parcels and have them sent to him, it would look suspicious, so the defendant sent emails himself asking postal staff across the country to intercept JOLT parcels and send them to him." *Id.* at 25:8-14.
- "[B]etween January 1, 2019 and August 11, 2023, the defendant requested either directly or through support staff that about 1,950 JOLT parcels be intercepted and sent to him. In addition to parcels on the JOLT reports, the defendant received packages suspected of containing cash from other sources. When he learned of complaints filed by customers who reported that packages containing cash had not been delivered, he tried to intercept them. And when postal workers notified the defendant of parcels that they suspected contained cash mailed by scam victims, the defendant took those parcels." *Id.* at 25:15-25.
- "When the defendant received an intercepted parcel he tried to determine based on how it looked and felt whether it contained cash. If he believed it contained cash, he opened it and stole any cash inside. If he did not think the parcel contained cash, he gave it to an inspector on his team to deal with or asked a support staff person to return the parcel to the sender." *Id.* at 26:1-7.
- "[A]n Inspection Service analyst would testify that based on postal tracking data,

hundreds of JOLT parcels were intercepted and delivered to the Barnes Building with no evidence they were ever returned to the senders." *Id.* at 26:8-12.

- "[T]he defendant possessed approximately $340,000 cash during the period when hundreds of intercepted JOLT parcels were being delivered to him, and that cash falls into three buckets." *Id.* at 30:2-8.
  - "The first bucket is cash that the defendant deposited[,] a total of approximately $131,000." *Id.* at 30:9-10.
  - "The second bucket is cash that the defendant used to buy postal money orders which he then deposited into his bank accounts or used to pay credit card bills. … [T]he defendant paid about $158,000 cash to buy approximately 165 money orders." *Id.* at 30:17-23.
  - "The third bucket of cash possessed by the defendant during the period when hundreds of intercepted JOLT packages were being delivered to him is cash purchases totaling almost $50,000. These include $20,500 cash that the defendant paid for a patio around his backyard pool, $4,800 cash for a granite countertop on his pool bar and to heat the pool, $4,880 cash to install landscape lights around the pool and lighting for the pool bar, $4,300 cash for bar drinks and other expenses incurred during Caribbean cruises he took with his family, and $15,400 cash that the defendant paid to two prostitutes." *Id.* at 32:6-18.

As promised, the Court asked Kelley: "Mr. Kelley, do you disagree with anything [the prosecutor] said?" He replied: "No, Your Honor." The Court confirmed: "All right. Are you sure? You hesitated. If you want to talk to your attorney, you can." He replied: "I'm fine, thank

you." And his counsel confirmed immediately thereafter that there was no reason the plea should not go forward. *Id.* at 33:3-14.

## SENTENCING GUIDELINES

### I. Probation's and the Government's Positions

Probation and the Government agree that Counts 1-15 are grouped and yield the highest, and thus the applicable, offense level. PSR ¶¶ 95, 100. They agree on the following calculation:

- Controlling base offense level is 7. *Id.* ¶ 111.
- 10 levels are added because the loss is between $200,000 and $350,000. *Id.* ¶ 112.
- 2 levels are added because the offenses involved sophisticated means. *Id.* ¶ 114.
- 2 levels are added because Kelley knew or should have known that the victims of his crimes were vulnerable victims. *Id.* ¶ 115.
- 2 levels are added because Kelley's offenses involved a large number of vulnerable victims. *Id.* ¶ 116.
- 2 levels are added because Kelley abused a position of public trust. *Id.* ¶ 117.

This yields an adjusted offense level of 25, which is decreased by 2 levels because Kelley has accepted responsibility for his offenses. *Id.* ¶ 120. The resulting Total Offense Level calculated by the Government is 23.

Probation has added 2 levels under USSG 2B1.1(b)(2)(A)(i) (if the offense involved 10 or more victims). *Id.* ¶ 113. Thus, the Total Offense Level calculated by Probation is 25. *Id.* ¶ 123.

## II. Kelley's Objections

Despite his sworn admissions recounted above, and his strategic decision not to object to most of the underlying facts in the PSR, Kelley lodges myriad objections to the PSR, which Probation has ably addressed. PSR, pp.47-54. The Government responds to three of Kelley's objections, concerning (A) loss amount, (B) whether the number of his vulnerable victims is "large," and (C) whether he is entitled to a third point for acceptance of responsibility.

### A. Loss Amount

The Government and Probation agree that $341,898 is a conservative estimate of the amount of cash Kelley stole. Since this number falls between $200,000 and $350,000, a 10-level increase applies. *See* USSG § 2B1.1(b)(1)(F).

Kelley argues that he has admitted stealing only $62,000 from Victims 1-8. Since this number falls between $55,000 and $150,000, he maintains, his offense level should be increased by only 6 levels. *See* USSG § 2B1.1(b)(1)(D). PSR p.47 (Def. Objection #1). His position is untenable for several reasons.

***First***, the Guidelines are clear that "the court can use the gain that resulted from the offense as an alternative measure of loss" when "there is a loss but it reasonably cannot be determined." USSG § 2B1.1(b)(1), Loss Table Note (B). That provision was built for a case like this, where Kelley stole hundreds of packages in secret. Again, he did not keep a log accounting for his theft. Measuring Kelley's gain from the offenses is the only way to capture the scope of his theft.

***Second***, Kelley has already admitted, under oath, that he (whether directly or through others) attempted to intercept approximately 1,950 parcels. He admitted that when he intercepted a parcel, he tried to determine whether it contained cash—and if he thought it did, he opened the

parcel and stole the cash inside. He admitted that the Government would show at trial that hundreds of parcels were successfully intercepted and sent to him with no record of their being returned to the victims. And he admitted to approximately $340,000 in cash deposits and expenditures over the same period he was stealing cash from hundreds of packages. This is sworn testimony in open court with the benefit of counsel. Kelley offers no innocent explanation for the source of the $340,000. The only explanation is the obvious one: he stole it from the hundreds of packages he intercepted, some of which he admits contained amounts of up to $15,000 (*see* Victim 5, *supra*). USSG § 2B1.1 Application Note 3(B) ("The court need only make a reasonable estimate of the loss.").

***Third,*** in addition to his sworn admissions, Kelley states no objection to Paragraphs 69-80 in the PSR, detailing his $341,898 in cash deposits and expenditures between January 1, 2019, and August 11, 2023. He also states no objection to Paragraphs 19-31, which explain (as already described) that Kelley attempted to intercept approximately 1,950 parcels from the JOLT process; intercepted additional packages from other sources suspected of containing cash; stole any cash he found inside those packages; and did so in a manner that made it impossible to know exactly how many he stole. His admissions in Court are binding. *See United States v. Shepard*, 231 F.3d 56, 68 (1st Cir. 2000) ("If the relevant facts contained in the PSR are uncontested, the court may consider these as further admissions by the defendant."); *see also United States v. Cyr*, 337 F.3d 96, 100 (1st Cir. 2003) ("Generally, a PSR bears sufficient indicia of reliability to permit the district court to rely on it at sentencing. The defendant is free to challenge any assertions in the PSR with countervailing evidence or proffers … but if the defendant's objections to the PSR are merely rhetorical and unsupported by countervailing proof, the district court is entitled to rely on

the facts in the PSR.”).

***Fourth***, Kelley, who failed to pay taxes on any of the cash he stole, has agreed to pay $71,816 in restitution to the IRS. That, too, is an implicit admission to a total loss amount of approximately $341,898. If he stole only $62,000, he would not agree to pay $71,816 in taxes.

***Finally***, to the extent that Kelley takes issue with the arithmetic, the First Circuit has made clear:

> In calculating loss amounts under the Guidelines, a district court evaluates losses stemming from the conduct of conviction and any relevant conduct. *United States v. Flores-Seda*, 423 F.3d 17, 20-21 (1st Cir. 2005). “Determination of actual loss need not be precise; ‘[t]he court need only make a reasonable estimate of the range of loss, given the available information.’” *United States v. Brandon*, 17 F.3d 409, 457 (1st Cir. 1994) (quoting USSG § 2F1.1 cmt. n. 8 (1994)) (alteration in original). A court may base a loss estimate on factors including “[t]he approximate number of victims multiplied by the average loss to each victim” and on “[m]ore general factors, such as the scope and duration of the offense and revenues generated by similar operations.” USSG § 2B1.1, cmt. n. 3(C)(iii) and (iv) (2005). “[T]he district court ‘may rely on the [Presentence Report], affidavits, documentary exhibits, and submissions of counsel.’” *United States v. Ranney*, 298 F.3d 74, 81 (1st Cir. 2002).

*United States v. Curran*, 525 F.3d 74, 78 (1st Cir. 2008).

***

More fundamentally, Kelley’s attempt to evade the loss calculation does more than contradict his own sworn admissions. It is also an attempt, even now, to benefit from his own deception. He took advantage of his position as a law enforcement supervisor whom no one would question to steal packages in secret and covered his tracks while doing so. Basic equity teaches that parties should not benefit from destroying evidence. That insight animates legal principles like missing witness and spoliation instructions. The same logic applies here. Kelley should not be heard to complain that the Government has failed to produce the packages that he stole—or call all the victims, many of whom are now deceased or in memory care. He should not

be rewarded for concealing his crimes.

B. Large Number of Vulnerable Victims

Probation and the Government agree the offense level should be increased by 2 levels because Kelley knew that his offenses involved a "large number" of vulnerable victims. USSG § 3A1.1(b)(2). Kelley argues that the number of his vulnerable victims is not large, PSR pp.47-48 (Def. Obj. #1), and cites an Eighth Circuit case in which 14 vulnerable victims was held to be a large number, *United States v. Boll*, 3 F.4th 1099, 1102 (8th Cir. 2021). The Government has already identified 12 elderly victims (Victims 1-4 and 6-13) by name. *See* PSR ¶¶ 37-68.

Kelley's objection is untenable for the same reasons that his objection to the loss amount is untenable. Again, he has admitted to trying to intercept nearly 2,000 packages and successfully receiving hundreds—which he would search for cash and steal any he found. *See* PSR ¶ 27. That corresponds to *hundreds of vulnerable victims*: hundreds of people vulnerable enough to fall for scams who had the compounded misfortune of having Scott Kelley assigned to protect them. Suggesting that Kelley did not harm a "large number" of vulnerable victims blinks reality.

C. Acceptance of Responsibility

Kelley continues to insist that he should be afforded a third point for acceptance of responsibility under USSG § 3E1.1. This fails, first, as a matter of law: a third point is afforded only if the Government moves for such, and the Government has not. *See United States v. Beatty*, 538 F.3d 8, 14 (1st Cir. 2008) (joining "[e]very other circuit" in holding that the third point is "contingent on the Government's decision to file a motion requesting the reduction."). Nor is the Government wrong to refuse. Kelley executed the Plea Agreement on July 24, 2026—nearly three years after he was placed on administrative leave, and only one month before trial on a 45-

count Indictment was scheduled to commence. By that point, the Government—including the trial attorneys, case agents, and Government witnesses—were fully devoted to trial preparation: preparing witnesses and exhibits, drafting jury instructions and motions *in limine* and a trial brief, and building summary exhibits to capture thousands of data points to present the scope of Kelley's scheme clearly and succinctly to the jury. *See* USSG § 3E1.1(b) (defining "preparing for trial"). This preparation did not just tax the Government's resources in the exact manner that the third point is designed to avoid. Rather, many of the witnesses the Government had begun preparing were Kelley's elderly victims, as well as retired civilian employees whom Kelley had coerced to unwittingly assist his thefts for years. As the victim impact statements attest, the elderly victims were stressed and scared by the prospect of trial and were relieved of that fear only a month before it began, when Kelley's pleaded guilty. Many had already made travel arrangements. One victim, who feared she would be too anxious to testify at trial, had collected her medical records to support a possible Rule 15 motion by the Government to preserve her testimony through a pretrial deposition. Kelley, had he accepted responsibility for the crimes he knew he committed, could have spared the victims that stress. Instead, he moved to continue the trial date, *see* Dkt. 53, and then waited until just four weeks out to sign the Plea Agreement.

Kelley's objections to the PSR further belie his presumption for a third point. With no sense of irony, he touts his acceptance of responsibility while simultaneously trying to deny the amount of money he stole and the number of victims he harmed. And, worse, after executing the Plea Agreement, he proposed agreeing to pay restitution to Victims 9-13 (which he now contests) in exchange for a Government motion for the third point. That is not acceptance of responsibility. It is, quite literally, the opposite.

Nor should the Court credit Kelley's invocation of the Government's suggestion, in October 2024, that a proffer could be beneficial. *See* PSR p.53 (Def. Obj. #11). That full email exchange is attached as Exhibit 2. It shows that on October 24, 2024, defense counsel discussed the idea of a proffer and explained: "I think you might find there are innocent explanations for what your office is investigating." Yet now he has admitted there was no such thing. In other words, Kelley offered to lie. Again, denying one's crimes is not acceptance of responsibility. Again, it is the opposite.

Kelley's position on acceptance is all the more brazen given that he was a federal law enforcement officer. He investigated and charged criminal cases in this Court. He has attended dozens of pleas and sentencings. He, of all people, should know what acceptance of responsibility looks like. Acceptance looks like a candid admission to the full scope of one's harm, a ready effort to remedy that harm, all coupled with solemn remorse. Kelley has shown no such thing.

## RESTITUTION

### I. Victims 9-13

Probation and the Government agree that Victims 9-13 are entitled to $35,170 in restitution. PSR ¶ 89. Kelley objects solely on the basis that these victims were disclosed after the Rule 11 hearing. That is not a basis to avoid restitution. *See* 18 U.S.C. § 3664(d)(5) (contemplating notice up to 10 days prior to sentencing, and outlining procedure for victims discovered after sentencing); *see also* Plea Agreement, ¶ 7(b) (Government's reservation of rights to identify additional victims). Kelley made no objection to the *facts* about these victims articulated in ¶¶ 60-68 of the PSR. Accordingly, the Court should order restitution to Victims 9-13 in the amounts detailed in Paragraph 89.

### II. The IRS

In the Plea Agreement Kelley has agreed to pay $71,816 in restitution to the IRS. Plea Agreement ¶ 7(b). That number was based on an outdated Government calculation of the tax loss, which did not include all the cash purchases Kelley had admitted to. The Government has since re-calculated the loss amount using the full scope of cash deposits identified in the PSR, which results in a tax loss of $78,867—the number reflected in Paragraph 84 in the PSR. As noted in Paragraph 90, the Court can order the additional $7,051 as a condition of supervised release. *See* 18 U.S.C. § 3583(d) (authorizing any condition under Section 3563(b)); 18 U.S.C. § 3563(b)(2) (authorizing restitution to victims). That is what the Government recommends.

## SENTENCING FACTORS

Each of the Section 3553(a) sentencing factors supports the Government's recommendation and undermines Kelley's. The Government walks through two particularly pertinent provisions below.

***The Seriousness of the Offense, Respect for the Law, and Just Punishment.*** Mail fraud scams target the vulnerable. Crimes by law enforcement abuse the public's trust. Scott Kelley did both. And he did so out of greed and nothing more. That compounded harm merits the enhancements discussed above and calls for a firm and unequivocal response from the Court. The Government's recommended sentence would supply that response.

Kelley did not just steal. He was a sworn federal law enforcement agent bound by oath to protect the victims he stole from. As the Team Leader in charge of the Mail Fraud Unit, he had the unique opportunity to seize and return money that seniors lost to scammers, to protect the elderly, and to earn their gratitude and trust. Instead, he used that opportunity to steal their money

and insult their dignity. And he did this at a time when public trust in institutions is imperiled. Rather than restore that trust, he brought shame to his office. A firm punishment will help balance that harm and restore the trust that Kelley eroded.

Did Kelley merely skim off the top from those who could "afford" it? No. He took from the elderly and the poor—individuals already vulnerable enough to fall for the scams in the first place, whose complaints he felt he could disregard because no one would care. The victims' statements speak to this reality. They already felt small, having been scammed in the first place. Kelley compounded that pain to live largely at their expense.

Did he have a momentary lapse in judgment? No. He stole for years, beginning no later than 2016 and continuing until August 2023. If anything, he grew emboldened, using the JOLT Report to systematize and nationalize his efforts. When he was transferred out of Mail Fraud, he persisted in his efforts from the shadows, emailing intercept requests without disclosing to the recipients that he was in a unit which had nothing to do with the JOLT.

Did he at least make efforts to insulate fellow agents and colleagues? No. He used his colleagues and subordinates as tools of his trade. He directed administrative employees to take substantial time away from their work to scan the nation's mail in search of cash that he could steal. He duped law enforcement partners in the state and across the country to be unwitting accomplices in his scheme to defraud. One wonders what legitimate postal and law enforcement work was left undone by employees and officers following Kelley's orders to (unbeknown to them) gather as much stolen proceeds for him as possible.

Did he come clean when confronted? No. When a supervisor at the Waltham post office contacted Kelley looking for Victim 4's parcel containing $5,400 cash, Kelley threatened to get

her fired. When he was faced with postal complaints, he did not reply, or he falsely claimed to have spoken with the victims, or he falsely claimed that the parcels had simply gone missing. Or, in the case of Victim 4, he had the audacity to go to her home and blame *her* for her missing cash. Victim 4 felt so uncomfortable around Kelley that she asked another member of law enforcement to be with her. Senior citizens should not have to call upon police to protect them from police. Yet Kelley made that a sad reality for Victim 4.

Finally, did he steal cash because he needed it? Again, no. The Court can see Kelley's comfortable finances. PSR ¶¶ 180-181. And the Court can see how the money was spent. This was not the paradigm of a hungry man stealing to buy bread. This was a corrupt agent stealing to pad his wallet, and enrich his lifestyle with a fancy pool set-up at home and visits to prostitutes while at work.

One can hardly imagine a better case study for promoting the rule of law than justly sentencing a law enforcement officer who abused his powers under the law to take from those whom the law was supposed to protect. The Government's recommended sentence accomplishes that goal.

***Adequate Deterrence.*** Scott Kelley will never again carry a badge to hide behind. But his crimes occurred within a broader context. Police corruption is grievous for obvious reasons. When citizens cannot trust the police, it degrades the rule of law and thereby wounds the civic body. Poisonous cynicism takes root when citizens see the police not only fail to protect them but also abuse their positions to enrich themselves instead. That is why law enforcement must be held to the highest standard. Postal Inspectors and staff in Kelley's former office carried out their duties with integrity and honesty every day. But as Kelley has shown, corruption is an ever-

present risk. To deter corruption in public service—and thus to protect against the wide and lamentable societal costs of corrupt government actors—it is vital that the Court send a clear message: if those with badges abuse them, significant incarceration will follow.

## CONCLUSION

For these many reasons, the United States recommends a sentence of forty-six months incarceration, thirty-six months of supervised release, a fine of $20,000, restitution in the amount of $35,170 to Victims 9-13 as detailed in the PSR, restitution to the IRS in the amount of $71,816 with an additional payment of $7,051 as a condition of supervised release, and a $4,400 mandatory special assessment.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: */s/ Eric L. Hawkins*
Christine Wichers
Eric L. Hawkins
Assistant U.S. Attorneys

## **Certificate of Service**

I certify that this document has been served on all counsel via ECF electronic filing on November 17, 2026.

*/s/ Eric L. Hawkins*
Eric L. Hawkins