UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | Crim. No. 25-cr-10355-ADB |
| SCOTT KELLEY | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

The right thing to do and the hard thing to do are usually one and the same. Mr. Kelley has done both and accepted responsibility for his crimes. He stands before the Court having pled guilty to multiple wire, mail, and tax fraud indictments, money laundering indictments, and a single count of structuring to evade reporting. He committed these crimes while he was a U.S. postal inspector and makes no excuse to minimize the seriousness of his misconduct. Mr. Kelley asks this Court to impose a sentence of 27 months, followed by 48 months of supervised release for the reasons that follow. This sentence is sufficient, but not greater than necessary to comply with the purposes enunciated by Congress in 18 U.S.C. § 3553(a).[1]

## I. Scott Kelley's Background & Personal Characteristics.

Mr. Kelley grew up in a tight-knit, Catholic family in Brockton, MA. His mother, Patricia Kelley, had left an abusive relationship with her three children before meeting Scott's father, William Kelley. She moved in with William together with Scott's older, maternal half brothers, Robert Fralick, Mike Fralick, and Mark Fralick. Scott's father embraced his three stepsons and raised them as they were his own. Scott was the youngest son, born on May 2, 1974. Patricia worked for Brockton's Highway Department, while Scott's father worked as an MBTA motor

[1] Mr. Kelley has separately addressed forfeiture in a contemporaneously-filed pleading.

man before later becoming a union official with the Boston Carmen's Union, local 589.

From a young age, Scott's parents impressed the importance of betterment through education and hard work, as well as service to others. Scott attended St. Casimir's School, a small Catholic school in Brockton, before matriculating to Cardinal Spellman High School. He excelled in sports, dipped his toe into high school theatre, was active in student government, and became a member of the Christian Service Project. An all-scholastic athlete and member of the high school's MIAA-Championship winning golf team, Scott coupled his athletic accomplishments with a curriculum that frequently focused on service to one's community. For example, Scott travelled to Ecuador during his junior year and spent three weeks working alongside locals to help build needed infrastructure. In his senior year, Scott continued his service work over multiple trips to Honduras to serve those in need there. Scott's family had modest means, and, with several older brothers, money was tight. Scott worked throughout high school in a series of jobs for spending money.

Scott was the dependable brother. While his older half-siblings similarly excelled in sports, they struggled with drugs and alcohol as they matured into adults. Scott's eldest brother, Rob, suffered from anger issues. He would lose control to the point that police needed to be called. Though he later had children, Rob was arrested multiple times for domestic violence and drug charges as an adult. He overdosed on fentanyl and passed away in 2020. Destitute at his death, Scott paid for Rob's funeral.

Older brother Mike had his own share of run-ins with the law, along with drug and alcohol problems. After a stint in the Department of Corrections, Mike became a lifelong union carpenter. In 2018, Mike suffered a devastating accident on a construction site in which he fell several stories from a lift. Scott helped him through his physical rehabilitation and provided

needed financial and emotional support until his brother's workman's compensation went through.

Scott's next oldest brother, Mark Fralick, similarly suffered from substance use issues. He was in and out trouble. His marriage ended in divorce, and he became functionally homeless. Scott, as well as his parents, lent Mark money from time to time, and Scott and his parents helped support his nieces and nephews financially to ensure all necessities were met. Mark's addiction to opiates led him to writing counterfeit checks and "borrowing" large sums from friends and family members to support his habit. Scott has supported him through multiple stints in rehab, and Mark is currently working as a teamster at the Mass. Convention Center.

Scott took a different path than his older brothers. He attended Bridgewater State College where he majored in Criminology. He worked his way through college with a full-time job at the Department of Youth Services ("DYS") in Brockton, MA. DYS is the juvenile justice agency for the Commonwealth. After graduation, Scott became a field caseworker for DYS in Brockton. He was responsible for devising treatment and service plans for youths who had recently paroled from DYS custody.

While working full time, Scott obtained his Master's in Criminal Justice from Anna Maria College. He applied for and was eventually accepted into his local police department as an officer upon his graduation from the Massachusetts Criminal Justice Police Academy in Weymouth, MA. Given his background, it is not surprising that he was stationed in Brockton public schools as what we would now call a school resource officer. He worked alongside school administrators, teachers, and other law enforcement professionals to provide safety and security in Brockton's public schools.

Scott also met the love of his life, Sara. Together, they had four children: Jack (19 years-

old), Liam (16 years-old), and twins Connor and Charles (13 years-old). Scott's eldest son, Jack, joined the U.S. Coast Guard Academy, and Scott was fortunate to attend the ceremony commemorating his entry into the service. His three younger sons are currently in high school.

In 2003, Scott decided to pursue a career in federal law enforcement and was offered a position at the U.S. Postal Inspection Service. Scott's career in federal law enforcement traversed many different tasks. He was initially assigned to the mail fraud, security, and child exploitation unit. Because many child pornography offenses were previously committed by mail, the U.S. Postal Inspection Services ("USPIS") handled a number of a child exploitation cases. Scott's impact was outsized. The victims in these cases had frequently been through hell and had trauma that would take years to heal, if it could at all. Scott collared a number of individuals in child sexual exploitation and child pornography production and distribution cases, which led to prosecutions against numerous individuals. He was subsequently assigned to the narcotics division and worked with the DEA to combat the sale of illicit drugs through the mail.

Based on his success in these posts, Scott was promoted to the Joint Terrorism Taskforce. In that role, he helped coordinate security at a number of high-profile events, including the Democratic National Convention in 2008.

Scott attended the Federal Law Enforcement Training Center in Glynco, Georgia, and was appointed to Guam to serve with the Naval Criminal Investigative Service ("NCIS"). NCIS is the civilian federal law enforcement agency uniquely responsible for investigating felony crime, preventing terrorism and protecting secrets for the Navy and Marine Corps. Scott loved working in Guam, but when Sara became pregnant with their eldest son, Scott requested a transfer back to the U.S. to work at USPIS. He realized that his career was now secondary to his family. When he returned to USPIS, Scott was assigned to Dangerous Mail Investigations, which

involved responding to reports of suspicious packages, potential IEDs, or chemicals leaking out of packages. For example, he assisted in the Anthrax investigation in Washington D.C. in the mid-aughts.

Throughout his career, Scott received numerous departmental awards and recognition for his outstanding service. He was awarded the Chief Inspector Award for his work in child exploitation investigations, several awards from the U.S. Attorney's Office from the District of Massachusetts for his work in combatting both violent crimes and exploitation cases. He received several positive merit evaluations from USPIS as a result of his exceptional performance. While acknowledging that the offenses occurred while Mr. Kelley was in a high-level role as a team leader at USPIS and on the job, his service was in other respects commendable.

Mr. Kelley was also an active member of the community. He coached youth sports for all four of his children, served on his town's board of baseball, and was a regular volunteer at his children's schools on pizza nights, bingo night, the town fun run, and field trips as a chaperone.

## II. Nature and Circumstances of the Offense.

From approximately 2016 to 2022, Mr. Kelley was the team leader of the Mail Fraud and Money Laundering Investigations Unit ("Mail Fraud Unit") for the Boston Division of USPIS. He supervised, investigated, and prevented fraud schemes that used the mail. From 2022 until 2023, Mr. Kelley was team leader of the Boston Division of USPIS's Mail Theft, Robbery, and Security Investigations. Mr. Kelley retired from USPIS, effective May 3, 2024, following the execution of the search warrant at his home.

On August 28, 2025, the government charged Mr. Kelley in a 45-count indictment with the following: wire fraud (counts 1-5), mail fraud (counts 6-10), mail theft by postal inspector

(counts 11-15), theft of government money (count 16), money laundering (counts 17-39), structuring to evade reporting requirements (count 40), and filing false tax returns (counts 41-45). The government filed a nolle prosequi to count 16 prior to Mr. Kelley's plea.

The conduct at issue is essentially one scheme. Between 2019 and 2023, Mr. Kelley intercepted packages suspected of being linked to Jamaican Operations Linked to Telemarketing ("JOLT") scams. JOLT scams targeted primarily elderly individuals. In essence, a scammer contacts the target victim by phone, informs the target that they won the lottery or some other prize (e.g., cash, a car, or a TV), and persuades the target to send cash through the mail to collect the prize. The scammer falsely claims that the target must pay cash upfront to cover "fees" or "taxes" before the scammer will send the much the larger – and nonexistent – prize to the target.

Mr. Kelley intercepted numerous packages in his capacity as a Postal Inspector. The Post Office did not cohesively track the packages requested for interception by Mr. Kelley or his subordinates, nor did it track how many of those packages actually came through the Barnes Building where Mr. Kelley's office was located. For example, if Mr. Kelley (or a subordinate) requested a local post office intercept five suspected JOLT packages, some or none of the packages might actually end up actually arriving at the Barnes Building.

The gist of the conduct is not in dispute, but the extent of it is. Mr. Kelley agrees that he stole the money within some of the packages, and attempted to disguise these unlawful proceeds by (i) not reporting the proceeds from this unlawful scheme as "income" on his taxes, (ii) paying for home improvements and other goods or services, including escorts, primarily in cash, (iii) making several large cash deposits into his bank accounts, and (iv) purchasing large numbers of money orders to then deposit in his bank account. The money orders were purchased in a way to

avoid reporting requirements and falsely listed various relatives as the "payor."[2]

In dispute is the government's (and probation's) assertion that Mr. Kelley began stealing the funds within these packages as early as 2016. Gov't Sentencing Memorandum at 4. There is not a shred of evidence to support this contention in the discovery or any other evidence that the government has produced. The government did not seek Mr. Kelley's bank, tax, or other related records between 2016 and 2018, nor has it provided a single instance where a suspected JOLT package between 2016 and 2018 was pilfered. The government's citation to its own description of the offense conduct, which probation copied and pasted into the PSR, is telling.

Further in dispute is the amount of money and packages taken during the offense conduct; i.e., between 2019 and 2023. What is abundantly clear from the discovery – and indeed what Mr. Kelley has pled guilty to – is that he intercepted eight suspected JOLT packages between 2019 and 2023 and stole the contents within. The total amount of funds amounts to $62,000, and Mr. Kelley has paid full restitution to each of these eight individuals. After his plea, the government identified five additional victims, Victims 9-13, totaling $35,170. Mr. Kelley intends to compensate these victims fully forthwith prior to his incarceration.

While the government asserts that Mr. Kelley in fact stole several more packages and much more money than that, the reality is that this is mere speculation. The government identified approximately $340,000 in unexplained deposits and spending among Mr. Kelley's bank statements and accounts between 2019 and 2023, including payments for home improvements, escorts, cash deposits, and money orders. The government maintains that these

[2] An individual may purchase two money orders, $1000 apiece, from a post office or bank without showing identification on the same day. If a person purchases three or more money orders in a single location at the same time, the bank or post office requires identification and records the transaction. Mr. Kelley purchased hundreds of money orders, and occasionally purchased two at one location (e.g., at the post office in Boston), and then two more on the same day in a different location, all to avoid detection.

unexplained funds reflect that Mr. Kelley embezzled currency that he pilfered from JOLT-affiliated packages. Yet, aside from the eight individuals previously known, the government has only been able to identify five further alleged victims totaling additional funds in the amount of $35,170. All of these occurred after Mr. Kelley's plea. Including the eight victims previously known, the total amount of packages that Mr. Kelley took, per the government, is 13, and the total amount of funds taken amounts to $95,170 – several $100,000 short of what the government asserts Mr. Kelley stole.

Through counsel, Mr. Kelley requested that the government identify each package or person, beyond the previously identified victims in the indictment, that Mr. Kelley is alleged to have taken and the amounts therein. The government responded, "It is impossible for the government to identify every package that Mr. Kelley intercepted." Gov't's Response to Defense Discovery Request # 1 (Feb. 5, 2026). There is a yawning gap – in excess of $200,000 – between the amount of unlawful proceeds that the government accuses Mr. Kelley of pilfering, laundering, and failing to report on his taxes (~$340,000) versus the amount actually lost by any identifiable victim ($95,170, including the five additional victims identified after Mr. Kelley's plea). Further, there is scant corroborating evidence to tie Mr. Kelley to any additional package thefts. The link is that Mr. Kelley or his subordinate (at his direction) requested additional packages for interception. It is unclear how many, if at all, passed through his office, what was inside of them, whether Mr. Kelley ever took possession of them, and whether he stole the contents within.

The discovery further reveals that the vast majority of the packages marked for interception were in fact returned to sender. During their investigation into Mr. Kelley, federal agents seized over 1,442 letters, correspondence, and related items from Mr. Kelley's office at

the Barnes Building that dated from 2018, 2019, 2020, 2021, and 2022. (Bates Stamp #'s USAO-SK-00015234 USAO-SK-00016675). These correspondences constitute return to sender letters addressed to the senders of JOLT packages from Mr. Kelley and contain a duplicate copy to verify that they were received by the sender. To be clear, these were pre-printed forms that Mr. Kelley's administrative assistants generated when suspected JOLT packages were returned to sender.

While the government asserts that Mr. Kelley "received *hundreds* of JOLT packages at the Barnes Building," its further contention that Mr. Kelley stole money from within each package is mere speculation. There is simply no ear, eye, or other type of witness who corroborates that Mr. Kelley stole money from within these 100s of packages. There is no record of how much money was in these packages, how many packages actually arrived at the Barnes Building versus how many did not, or which packages were taken or how much was inside. Such evidence simply does not exist.

The government's recitation of the "sample victims," victims 1-13 constitute not a sample but rather *the only known victims* whose packages were stolen and money was taken in this case. Gov't Sentencing memo at 6-15. The government asserts that "it is impossible to know exactly how many packages Kelley stole," and that "it is impossible to know exactly how much cash Kelley stole." Gov't Sentencing Memo at 6, 15, respectively. A more direct accounting of his conduct is that the government does not have proof that he stole any other packages or any other money aside from the 13 victims recounted in the PSR.

The government points to Mr. Kelley's admissions under oath at the Rule 11 hearing as evidence that Mr. Kelley admitted he pilfered $340,000 from intercepted JOLT packages. Gov't Sentencing Memo at 17-19. What Mr. Kelley in fact admitted to was that he "possessed

approximately $340,000 cash during the period" of 2019 to 2023 in different forms (cash deposits, money orders, cash purchases) – a fact that is not in dispute. Gov't Sentencing Memo, Exhibit 1 at 30. In no way did that equate to his admitting that he stole the money from pilfered JOLT packages.

## III. Mr. Kelley's Post-Offense Rehabilitation.

### a. Acceptance of Responsibility: Prior Attempts to Resolve this Matter.

Mr. Kelley attempted to resolve this matter prior to his indictment. The government was unwilling to meet at any point with counsel or with Mr. Kelley and now claims that Mr. Kelley "offered to lie." Gov't Sentencing Memo at 26. The facts do not support the government's narrative.

Mr. Kelley's home was searched pursuant to a warrant on February 27, 2024. This matter was previously handled by Assistant U.S. Attorney Eugenia Carris ("A-USA Carris"), who has since departed the office. On March 25, 2024, counsel for Mr. Kelley sent A-USA Carris a letter requesting a reverse proffer to "facilitate pre-charge cooperation and negotiations." Exhibit 1, March 25, 2024 Correspondence to A-USA Carris. At the time of sending this letter and based on the limited information shared, the government appeared to be investigating Mr. Kelley for a single lost package, some money orders, and the $7,000 taken from the High Value Evidence Value ("HVE Vault") at the post office.[3]

A-USA Carris responded, "Dear Jay and Nat, Thank you for the letter. I hope you are both well also. Copied here also are Assistant U.S. Attorneys Dustin Chao and Elysa Wan, who are my colleagues in this matter. Dustin is the Chief of the Public Corruption & Special

[3] This theft would later form the basis for count 16, which was nolle prosequi'd by the government following Mr. Kelley's notice of an alibi defense and his plea to the other indictments.

Prosecutions Unit. We will reach out at an appropriate time." Exhibit 2, E-mail from A-USA Carris, March 25, 2024. A-USA Carris indicated that the investigation was looking into lost packages and/or money orders, in addition to the money missing from the HVE vault.

No one from the U.S. Attorney's office followed up at any point. Over six months later, undersigned counsel visited the U.S. Attorney's Office for an unrelated matter in which counsel represented a witness that Assistant U.S. Attorney Dustin Chao ("A-USA Chao") was preparing to testify at trial. After the meeting, A-USA Chao shed further light on the investigation, including that the investigation involved money orders and lost or stolen packages, and directed counsel to e-mail him to follow up. Per these instructions, counsel e-mailed A-USA Chao if his office would be willing to meet with Mr. Kelley in a reverse proffer as "it's not exactly clear what the allegations are, which is why we proposed the reverse proffer." Exhibit 3, E-mail to A-USA Chao dated Oct. 24, 2024. "A reverse proffer would not be needed if you could give us a better sense of what your office is alleging in terms of Mr. Kelley's wrongdoing." *Id.*

A-USA Chao responded the same day, "A reverse proffer could be a good idea. I will leave it to you and Christine Wichers to hash out any arrangements on that." Exhibit 4, E-mail from A-USA Chao. Counsel immediately followed up with A-USA Wichers, "I was hoping we could schedule a reverse proffer for Mr. Kelley in the next few weeks. I would be grateful if you could let me know what days/times work for you. Look forward to meeting you in person." Exhibit 5, E-mail to A-USA Wichers, Oct. 24, 2024.

A-USA Wichers did not respond. Instead, eleven months later she obtained an indictment against Mr. Kelley, had him arrested at his home even though the government was not even seeking detention at his first appearance, and she chose to do this on the Friday before Labor Day in 2025. Where the government asserts it has attached "that full e-mail exchange" between

counsel for Mr. Kelley and the government, that is inaccurate. Gov't Sentencing Memo at 26. Where the government asserts that Mr. Kelley "offered to lie," *id.*, yet again, this characterization is misleading.

The government's narrative obfuscates and mischaracterizes these pre-charge discussions to deny Mr. Kelley a point for acceptance of responsibility. After his indictment, Mr. Kelley negotiated with the government over several months. Mr. Kelley requested several prior plea offers. The Parties substantially negotiated a plea agreement in April and again at the end of May 2026. On June 1, 2026, Mr. Kelley elected to bring in new counsel, Attorney Hank Brennan, to examine the evidence in this case and review a potential resolution. *See* ECF No. 57. Following that review, Mr. Kelley quickly signaled his intention to plead guilty and did so expeditiously.

Since his plea, he has paid restitution in the amount of $62,000 to the eight victims identified in the plea agreement and at sentencing. *See* ECF No. 70. He has also advised the government that he intends to pay full restitution to Victims 9 through 13.

**b. <u>Family and Community Support and Engagement.</u>**

With the Court's permission, Mr. Kelley began restorative justice programming in fall 2026. ECF No. 72. The Court's restorative justice programming was at capacity. Yet, Mr. Kelley voluntarily sought out restorative justice programming with the assistance of the U.S. Probation Office with an independent vendor. On October 27, 2026, he began restorative justice programming with Transformational Prison Project ("TPP"). TPP's restorative justice programming course is for six weeks. Each session is 90 minutes per week. The sessions focus offenders on examining the harm they caused, how to repair that harm, and to take accountability and make amends while committing to change. Mr. Kelley has attended the first three sessions and is nearly halfway towards completion.

Mr. Kelley currently works part-time as an accident photographer for Valuation Research Cooperation. He earns approximately $40/hour working 25 hours per week. He photographs car and boating accident scenes, which can then be used by insurance companies to assist in accident reconstruction diagrams. It is a modest living that keeps him busy.

Recognizing the adverse role that alcohol played in his commission of the instant offenses, Mr. Kelley also began attending alcoholics anonymous. His increased alcohol intake in the five years before his arrest was largely due to the loss of his father, mother, and eldest brother in quick succession. Always a social drinker, Mr. Kelley increasingly turned to alcohol to ease the pain and discomfort that he had over these losses. His alcohol use became a recurrent argument between him and his spouse. PSR at ¶ 167. Since his arrest, however, Mr. Kelley has functionally stopped drinking.

Quite possibly the most important amends that Mr. Kelley had to make were to his spouse, Sara, and his four sons. A major part of his acceptance of responsibility was his coming clean to his spouse and admitting that he betrayed her trust and their marriage numerous times. Mr. Kelley has done so, and his spouse continues to support him. Additionally, Mr. Kelley has remained an active and involved parent. He regularly attends his son's sporting events, counsels them on the errors he made in life and how to avoid them, and supports his sons' growth into becoming productive members of society. Emblematic of his success is his eldest son's enrollment in the U.S. Coast Guard Academy this past fall. As a result of Mr. Kelley's incarceration in this matter, he will not see his three younger sons graduate from high school nor be present for them through their difficult teen years as they mature into men.

Appended as Exhibit 6 are letters of support from Mr. Kelley's friends and family members. Mark describes his younger brother as the moral compass for the family prior to his

arrest. Yet, he also recognized that his father's passing quickly followed by their mother's serious illness in 2018 before her death in 2023 caused a shift in the family dynamics. Scott's misconduct was "so out of character," and, while the conduct is extremely serious, Scott is fundamentally a good man. Ex. 6.

Scott's other brother, Michael, describes Scott as a "hardworking, dependable, and compassionate person." Ex. 6. After Michael's grievous accident, "Scott was one of the few people who consistently stood by my side. When many others were unable or unwilling to help, Scott made certain that I never went without the support I needed." Ex. 6. Scott would drive long distances to get medications, provide food or other necessities, and helped Michael get to medication appointments. "He provided not only practical assistance but also emotional support during one of the most difficult periods of my life. His actions were never done for recognition; they came from genuine love, compassion, and concern for his family." Ex. 6.

Scott's childhood best friend is similarly effusive. He has known Scott to be devoted husband and father who loves his family and takes his responsibilities seriously. Ex. 6. "One of the things that has always stood out to me about Scott is his willingness to be there for others. He is the type of person who doesn't hesitate to lend a helping hand when someone is in need." Ex. 6. While his friend appreciates the seriousness of the circumstances that bring him before the Court, the person that Tom has known for 45 years "is much more than the circumstances he is currently facing." Ex. 6.

## IV. **Sentencing Guidelines.**

Mr. Kelley disagrees with the government's and probation's assessments of his total offense level. Where the government and probation calculated Mr. Kelley's total offense level to be 25, Mr. Kelley maintains that his total offense level should be properly calculated at 19 and

the Court should award Mr. Kelley the final point for his full acceptance of responsibility, which equates to a total adjusted offense level of 18 based on the following calculations for counts 1-15, 17-39, 40, and 41-45:

Based Level Offense: 7 (USSG § 2B1.1(a)(1))

Loss Amount Enhancement: +6 (USSG § 2B1.1(b)(1)(D)) ($55,000 – $150,000)

Conviction under 18 U.S.C. § 1956 Enhancement: +2 (USSG § 2S1.1(b)(2)(B))

Vulnerable Victim Enhancement: +2 (USSG § 3A1.1(b)(1)

Abuse of Position of Trust: + 2 (USSG § 3B1.3)

Sophisticated Means: +2 (USSG § 2B1.1(b)(1))

Acceptance of Responsibility: -2 (USSG § 3E1.1(a))

Discretionary Acceptance of Responsibility: -1 (U.S.S.G. § 3E1.1(b)

Total Adjusted Offense Level: 18

Mr. Kelley specifically objects to the following enhancements urged by the Government and Probation:

**a. <u>Loss Amount Calculation.</u>**

The government has not shown by preponderance that the loss amount was anywhere close to $340,000. *See United States v. Rodriguez*, 115 F.4th 24, 49 (1st Cir. 2024) (government bears burden by preponderance to demonstrate sentencing enhancement applies). Here, the government has failed to carry its burden. Aside from the 13 identified victims whose packages were taken – five of whom were discovered after Mr. Kelley's plea – there is not a single other individual, complaint, package, or other parcel of mail that connects Mr. Kelley to stealing anything.

The government asserts that because Mr. Kelley's loss cannot be reasonably determined,

loss can be measured by Mr. Kelley's gains. Gov't Sentencing Memo at 21, citing USSG § 2B1.1(b)(1), Loss Table Note (B). Per the government, "That provision was built for a case like this, where Kelley stole hundreds of packages in secret." *Id.*

Again, the government has zero evidence that Mr. Kelley stole a single package beyond the thirteen identified in the PSR, let alone how much money was contained in these unknown packages. The government attempts to burden shift by suggesting Mr. Kelley should have kept a log of his theft or have an explanation for these funds. Gov't Sentencing Memo at 22 ("Kelley offers no innocent explanation for the source of the $340,000."). But this contravenes case law: where the government bears a burden to prove loss amount, throwing up its hands and saying we don't know but we think it should be this amount cannot substitute for evidence.

Next, the government urges the Court to consider that Mr. Kelley did not object to the loss amount in the PSR. Gov't Sentencing Memo at 21 Yet, again, the government is misleading with omissions. Mr. Kelley repeatedly objected to the loss amount calculated by probation and the government. *See* PSR at 47, 51, and 52.

Finally, the government asserts that Mr. Kelley failed to pay taxes on for reported income reflect in the cash deposits and spending. This, in the government's view, is "an implicit admission" that he stole $341,898. Gov't's Sentencing Memo at 23. Wrong. It is an explicit admission that Mr. Kelley filed false tax returns by not reporting his income; i.e., counts 41-44 of the indictments. It is not an admission that he stole ~$340,000 from suspected JOLT packages.

In urging the Court to adopt its loss amount calculation, the government asserts that Mr. Kelley "destroy[ed] evidence" and his actions equate to the spoilation of evidence. Govt's Sentencing Memo at 23. If that were true, the government should provide evidence to support it. Yet, it has not. Moreover, if that had actually occurred, why didn't the government seek the

obstruction sentencing enhancement?

Because, of course, it is yet another fiction that the government hopes this Court will believe is truth. It is narrative over facts; speculation over evidence.

What the evidence in fact supports is that Mr. Kelley stole and has pled guilty to taking approximately $62,000. Including the victims that the government identified post plea, that total is now approximately $95,000. As such, the applicable loss amount enhancement places the loss between $55,000 and $150,000. The proper loss amount enhancement corresponds to U.S.S.G. §2B1.1(b)(1)(D).

**b. Large Number of Vulnerable Victims.**

Mr. Kelley objects to the application of the large number of vulnerable victims enhancement. USSG §3A1.1(b)(2)(+2). At the time of plea, there were seven identified victims, not all of whom were vulnerable. Persuasive authority holds that seven does not constitute a large number of vulnerable victims. In *United States v. Mooty*, the 8th Circuit held "that seven victims were particularly vulnerable to [defendant's] fraudulent activity, and we hold that seven is not, as a matter of law, a 'large number,' within the meaning of" USSG. §3A1.1(b)(2). 25 Fed. Appx. 501 (8th Cir. 2002). In *Mooty*, the defendant pled guilty to three counts of mail fraud, two counts of wire fraud, and additional aiding and abetting charges. The district court had applied the "large number of vulnerable victims" enhancement, and the 8th Circuit reversed in an unpublished per curiam decision by holding seven victims is not a large number of vulnerable victims for the enhancement to apply. *Id.*

In *United States v. Buckman*, the Eastern District of Pennsylvania similarly held that 18 victims in a property fraud scheme do not constitute a "large number" of vulnerable victims contemplated by the sentencing guidelines. No. 14-cr-540, 2019 WL 142385, at *21-22 (E.D. Pa.

2019); *but see United States v. Boll*, 3 F.4th 1099, 1102 (8th Cir. 2021) (holding 14 patients from whom defendant stole medication constituted large number of vulnerable victims in part because the defendant was "hands on with these patients;" further commenting 14 might not be a large number if the offense "involves only indirect contact or is committed in a completely different way.").

In Mr. Kelley's case, there were seven identified victims at the time of plea. Per *Mooty*, this is not a "large number of vulnerable victims," such that the additional +2 enhancement under USSG § 3A1.1(b)(2) should apply.

The government asserts that it has met its burden because "it has already identified 12 elderly victims (Victims 1-4 and 6-13) by name." Gov't Sentencing Memo at 24. According to the government, Mr. Kelley's admissions at his Rule 11 hearing equates "to *hundreds of vulnerable victims*: hundreds of people vulnerable enough to fall for scams who had the compounded misfortune of having Scott Kelley assigned to protect them." *Id.*

Putting aside that the government's contention that there are potentially "hundreds of [unknown and unidentified] vulnerable victims" as meritless, binding First Circuit precedent indicates that age is alone is insufficient to show vulnerability in regards to the identified victims in this case. "In determining the propriety of an upward adjustment for vulnerability, the sentencing court's sights must be trained on the victim's individual characteristics. Thus, in order to warrant a finding of unusual vulnerability, there must be some evidence, above and beyond mere membership in a large class, that the victim possessed a special weakness that the defendant exploited." *See United States v. Feldman*, 83 F.3d 9, 15 (1st Cir. 1996) citing *United States v. Smith*, 930 F.2d 1450, 1455 (10th Cir. 1991) (holding advanced age, without more, does not render a victim unusually vulnerable); *see also United States v. Rowe*, 999 F.2d 14, 17 (1st

Cir. 1993) (cautioning that courts cannot predicate a finding of unusual vulnerability on generalizations about large classes to which the victim belongs).

Here, the government has failed to carry its burden that the large number of vulnerable victims enhancement applies. As such, this Court should decline to adopt it.

**c. <u>Acceptance of Responsibility.</u>**

Not to belabor the point, but the government is wrong to deny Mr. Kelley full acceptance of responsibility. The third point for acceptance of responsibility holds only the government may move for such a reduction if responsibility is accepted in a manner that permits the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently. USSG § 3E1.1(b). "'Preparing for trial' is ordinarily indicated by actions taken close to trial, such as preparing witnesses for trial, in limine motions, proposed voir dire questions and jury instructions, and witness and exhibit lists." USSG § 3E1.1. The government did not file single motion in limine. The government notified counsel of a sum total of two trial exhibits, which included the HVE Vault instructions and a voice mail log book recovered on Mr. Kelley's desk. These exhibits were relevant to the only charge that the government nolle pros'd (count 16) and not the substantive offenses to which he pled guilty.

The government asserts not that it had prepared witnesses but that it had "begun preparing" witnesses. Gov't Sentencing Memo at 25. While the government claims that it had drafted jury instructions, motions in limine, and a trial brief, as well as summary exhibits, none of that has been shared with counsel, was contained in the *Jenks* discovery provided in June 2026, or was ever filed with this Court. Beginning to prepare for trial is not the same as preparing for trial. The temporal distinction that the government asserts in its memo is meaningless. *See* Gov't Sentencing Memo at 24 ("Kelley executed the Plea Agreement on July

24, 2026 – nearly three years after he was placed on administrative leave."). Mr. Kelley wasn't even charged until 2025.

USSG § 3E1.1(b)'s awarding a third point based on the government's motion requires good faith dealing from the government. Claiming Mr. Kelley does not deserve the third point because he did not seek to plead guilty to crimes that he had not been charged with after being placed on administrative leave reflects the opposite. The government's approach here renders the discretionary point under USSG § 3E1.1(b) subject to the arbitrary caprice of a disgruntled prosecutor.

More to the point, the government views it as pernicious that Mr. Kelley offered to make immediate restitution to victims 9-13, which the government identified after his plea, in exchange for the government's moving for the third point. This would ensure these victims would be compensated immediately. Assistant U.S. Attorney Wichers declined. She would rather be able to recommend a six month longer incarcerative sentence for Mr. Kelley than these elderly folks be timely compensated. Contrast 34 U.S.C. § 20141(c)(1)(B) (responsible official "shall…inform a victim of any restitution or other relief to which the victim may be entitled under this or any other law and manner in which such relief may be obtained.").

Regardless, Mr. Kelley intends to compensate Victims 9-13 because it is the right thing to do, and because he accepts responsibility.

**d. <u>USSG § 3E1.1(b) is unconstitutional.</u>**

Though this Court need not reach this issue should it award Mr. Kelley the third point, Mr. Kelley further asks this Court to hold USSG § 3E1.1(b) unconstitutional in violation of the Sixth Amendment of the U.S. Constitution. *See United States v. Tavberidze*, 769 F. Supp. 3d 264, 268-72 (S.D.N.Y. 2025).

In *United States v. Tavberidze*, U.S. District Court Judge Jed Rakoff concluded that § 3E1.1(b) "violates the Sixth Amendment right to trial in at least two ways." *Id.* at 270. First, § 3E1.1 "in its entirety effectively penalizes a defendant who, whether innocent or guilty, proceeds to trial based on his decision to exercise" his Sixth Amendment constitutional right to trial. *Id.* While subsection (a) justifies this imposition as a reward for a defendant's expression of genuine remorse, "the only ground given for imposing the additional penalty under § 3E1.1(b) is that the defendant failed to save the Government from having to prepare for trial. This cannot possibly be an adequate ground for penalizing a defendant for the exercise of a constitutional right. Worse still, on this flimsy basis § 3E1.1(b) penalizes a defendant who just takes too long to decide whether he wants to assert his constitutional right to trial, even if he ultimately waives it." *Id.*

This penalty is significant. In this case, it equates to an increase of six months of incarceration in terms of the government's recommendation for Mr. Kelley. Moreover, it is precisely what occurred here. Mr. Kelley and the government attempted to negotiate a resolution of this matter multiple times. After the government sent a revised plea offer on May 22, 2026, Mr. Kelley retained further, more experienced counsel to discuss his options: whether to go to trial or accept the plea offered by the government. After successor co-counsel completed that review and met with Mr. Kelley, Mr. Kelley quickly elected to resolve this matter.

Mr. Kelley is being punished  for simply considering exercising his constitutional right to a jury trial – not actually exercising. By "subjecting [the] defendant to a heightened Guidelines range based solely on his decision to proceed to trial – or even just for considering for too long, in the Government's view, his constitutional right to go to trial – § 3E1.1(b) place[d] an impermissible burden on [Mr. Kelley's] Sixth Amendment right." *Id.* at 271. As in all cases, the guidelines play an outsized at sentencing.

That § 3E1.1(b) can only be applied upon motion by the government further speaks to its unconstitutionality. Regardless of whether a district court finds the government had actually prepared for trial or, as the government asserts here, had merely "begun preparing" for trial, the point cannot be awarded if the government does not move for it. "By empowering the Government, rather than the district court, to determine the extent to which the defendant has relieved it of that burden and to decide whether he is therefore entitled to the reduction, § 3E1.1(b) amplifies the pressure exerted on a defendant to plead guilty, rather than proceed to trial." *Tavberidze*, 769 F. Supp. 3d at 272. Thus, it further burdened Mr. Kelley's exercise of his Sixth Amendment right to trial by penalizing him for even contemplating it longer than what the government views as appropriate.

As such, this Court should hold § 3E1.1(b) unconstitutional and adopt the remedy Judge Rakoff outlined in *Tavberidze* and reduce Mr. Kelley's total adjusted offense level by one point for full acceptance of responsibility. *Id.* at 273 (reducing offense level from 20 to 17).

**V. <u>Request for Variance.</u>**

Regardless of the Court's determination of Mr. Kelley's sentencing guidelines, Mr. Kelley nevertheless moves this Court to sentence him to 27 months incarceration, followed by 48 months of supervised release.

Even if the Court agrees with Probation's and the Government's calculation of the guidelines, a variance is appropriate. The advisory guideline sentencing range is the "starting point and the initial benchmark" but it is not the only consideration in the sentencing analysis. *Gall v. United States*, 552 U.S. 38, 49 (2007). There is no presumption that a guideline range is reasonable. *Id*. at 50. The Court must ultimately "make an individualized assessment based on the facts presented." *Id*. The Court must conduct a case-by-case analysis, "the hallmark of which

is flexibility." *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008). The overarching goal is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id*. (quoting *Gall*, 552 U.S. at 52).

When, as here, a defendant's sentencing guidelines are driven by a high loss amount guideline calculation, the Court must focus on the factors in 18 U.S.C. § 3553. The sentencing guidelines' loss amount enhancements are "fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges." *United States v. Corsey*, 723 F. 3d 366, 377 (2nd Cir. 2013) (Underhill, J., concurring). "Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable. But where, as here, the [loss amount] calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in § 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences." *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006).

Thus, the factors enunciated in 18 U.S.C. § 3553(a) must be considered when imposing a sentence. An examination of these factors supports Mr. Kelley's sentencing recommendation.

**a. <u>The Nature and Circumstances of the Offense & Characteristics of the Defendant.</u>**

It is not necessary to repeat what has already been said above. Mr. Kelley makes no attempt to minimize or excuse his crimes of conviction. He betrayed his badge, his office, his family, his friends, and all those who placed his trust in him. What he did was wrong, caused harm to the victims, and he knows it. Prior to this case, however, his background was one of an

upstanding, productive member of society. He was a dedicated law enforcement official whose work, in particular in child exploitation cases, was widely praised and lauded. He enjoyed the love and support of his family. He has a history of gainful employment, and he has continued to seek gainful employment while on pretrial conditions of release. With no prior record, this case represents an aberration in an otherwise law-abiding life.

Further, the Court should give consideration to Mr. Kelley's age and health when sentencing him. While he is only 52 years old, he is of an age when the difficulties of imprisonment begin to take a greater toll. Regardless of the length of his sentence, Mr. Kelley will be considered an elderly prisoner.[4] "While being old should not be an automatic get-out-of-jail-free card, infirmity and illness can change the calculus of what justice requires."[5] Research has shown that elderly prisoners, "even if they are not suffering illness, can find the ordinary rigors of prison particularly difficult because of a general decline in physical and often mental functioning which affects how they live in their environments and what they need to be healthy, safe, and have a sense of well-being. In addition to the memory loss and other ordinary cognitive impairments that can come with aging, older prisoners sooner or later will develop decreased sensory acuity, muscle mass loss, intolerance of adverse environmental conditions, dietary intolerance, and general vulnerability [which] precipitate collateral emotional and mental health problems."[6] Moreover, incarceration "compounds existing health issues and heightens the risk of

---

[4] The National Institute of Corrections, correctional experts, and criminologists mark 50 years of age as the appropriate age determining when a prisoner is "aging" or "elderly." See "At America's Expense: The Mass Incarceration of the Elderly," American Civil Liberties Union Report, June 2012, at p. v, accessible at https://www.aclu.org/files/assets/elderlyprisonreport_20120613_1.pdf

[5] Fellner, Jamie, "Graying Prisoners," *The New York Times*, Op-Ed, August 18, 2013, accessible at http://www.nytimes.com/2013/08/19/opinion/graying-prisoners.html?_r=1&

[6] "Old Behind Bars: The Aging Prison Population in the United States," Human Rights Watch

further health problems, [and also] causes incarcerated people to age at a much faster rate than people in the community. The phenomenon of 'accelerated aging,' … means that the body of an incarcerated 50-year-old often has a 'physiological age' that is 10 to 15 years older."[7] Mr. Kelley is likely to spend a substantial portion of his mid-50s incarcerated. As such, he is likely to experience the negative impacts of aging in prison that are described in these studies. Incarcerating him longer than the 27 months proposed would only exacerbate these concerns.

### b. <u>To Protect the Public from Future Crimes of the Defendant</u>

The evidence does not suggest that Mr. Kelley will present a threat of harm to the public. His offense was completed entirely in isolation, and he will have no access to any putative victim during his incarceration or thereafter. This is not a violent offense and there is no doubt Mr. Kelley will never again be placed in a law enforcement position again. Mr. Kelley's conduct since his arrest suggests that the risk to the public is minimal, given the substantial incarceration proposed by the defense. Further, Mr. Kelley has sought to make amends and take accountability by paying restitution to the victims identified by the government and through restorative justice programming. Mr. Kelley has been candid about his crimes, both during his PSR interview and during his time in restorative justice.

Moreover, there are no additional factors in Mr. Kelley's background that suggest that he will pose a danger to the public once released. On the contrary, his background and personal characteristics point in the opposite direction – that he can be safely managed in the community

---

Report, 2012 at p. 45, accessible at https://www.hrw.org/sites/default/files/reports/usprisons0112webwcover_0_0.pdf (internal quotations omitted).

[7] "The High Costs of Low Risk: The Crisis of America's Aging Prison Population," The Osborne Association, 2018 at p. 22, accessible at https://www.osborneny.org/assets/files/Osborne_HighCostsofLowRisk.pdf

once released.

**c. The Need to Adequately Deter Criminal Conduct**

Mr. Kelley asserts that he himself has been adequately deterred from future criminal conduct given the events of this case. He has lost everything as a result of his misconduct: his career, his reputation, the trust of his loved ones, and his freedom. He will be a former federal law enforcement official entering the Bureau of Prisons custody. He is not under any illusion that his time in custody will pass easily or that his former career will go unnoticed by other inmates. He will be ripe for targeting, harassment, and violence while in custody. He is going to miss major family milestones for his sons and will not be there for them during their critical teenage years. He has lost all friends from his former job and is now a pariah in his community. His name has appeared in the media, and the community at large is aware of his offenses. Though he maintains the support of many of his loved ones, there are those who knew him prior to his arrest who want nothing to do with him. Mr. Kelley will live with this shame for the rest of his life, and this scarlet letter will follow him wherever he goes.

The lengthy term of incarceration proposed to the Court here should also deter others from criminal conduct. A plethora of studies suggest that there is no relationship between sentence length and general deterrence, regardless of the type of offense. *See e.g.*, Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (finding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield

significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence.”). In light of this research, little weight should be given to the deterrent effect of an unnecessarily long period of incarceration. To the extent the Court disagrees, however, there is no doubt that a multi-year sentence for a person who never committed a violent offense and has no prior criminal record is substantial and sufficiently addresses general deterrence.

The proposed term of incarceration is by no means insignificant. As described in the preceding section, Mr. Kelley will be incarcerated throughout his mid-50s. This is an age when many Americans are beginning to look towards retirement and seeing their children start families of their own. For Mr. Kelley, however, he will instead have to look forward to being released from prison and watch his children grow up from afar. It is a serious penalty for any person, let alone someone in Mr. Kelley’s circumstances. The penalty is consistent with the offenses for which he has been convicted, and his downfall complete.

## VI. <u>The Need to Avoid Unwanted Sentencing Disparities.</u>

The proposed sentence recommended by the defense is fair considering other similarly situated defendants and in many ways is significantly more punishing than similar cases prosecuted in this District.

For example, in *United States v. Nnamdi Opara*, the defendant stole a total of $700,767 from the U.S. Treasury in Treasury checks. No. 25-cr-10377-DJC (D. Mass. July 1, 2026). He was charged with two counts of bank fraud and five counts of money laundering. In addition, Mr. Opara conducted multiple illegal monetary transactions designed to conceal the source of the funds from the stolen Treasury checks. Mr. Opra was sentenced by U.S. District Court Chief Judge Denise J. Casper to 10 months in prison, with two years of supervised release. ECF No.

45, *United States v. Opara*, No. 25-cr-10377-DJC (D. Mass. July 1, 2026).

In *United States v. Dennis Condron*, Mr. Condron was accused of engaging in a multi-year income tax fraud scheme over a three-year period. No. 25-cr-30041-MGM (D. Mass. June 18, 2026). He hid over half a million dollars in customer checks by cashing them and diverting them to his personal accounts. *Id.* see ECF No. 15 (Gov't Sentencing Memo) filed May 18, 2026. He did not tell his preparer about the customer checks he was cashing and diverting – resulting in his tax returns underreporting the gross receipts of the business by hundreds of thousands of dollars. *Id.* The government recommended six months in prison. Mr. Condron was sentenced by U.S. District Court Judge Mark G. Mastroianni to a year of probation and a $40,000 fine. Mr. Condron was ordered to pay over $200,000 in restitution to the IRS. ECF No. 23, No. 25-cr-30041-MGM (Oct. 21, 2026).

In *United States v. Wyoming Killingbarrows*, Mr. Killingbarrows submitted 18 fraudulent bank loan applications. No. 25-cr-10138-ADB (D. Mass. June 11, 2026). He misrepresented his income and submitted fraudulent paystubs from a company in support of his applications. Based on these misrepresentations, various banks issued loans to Mr. Killingbarrows totaling $329,002 between June 2, 2021, and July 17, 2021. *See* ECF 27, Gov't Sentencing Memo, *Killingbarrows*, No. 25-cr-10138. He was sentenced by this Court to 10 months in prison, to be followed by two years of supervised release. Mr. Killingbarrows was also ordered to pay $329,002 in restitution. ECF No. 30, 25-cr-10138-ADB.

In *United States v. Thomas F. Clasby*, Mr. Clasby, a former Quincy Director of Elder Services, was indicted for a scheme to embezzle funds from the City of Quincy. He used funds to pay for framed self-portraits, 153 pounds of bourbon steak tips, music studio recording and a Toyota Prius. Mr. Clasby was sentenced by U.S. Senior District Court Judge Patti B. Saris to six

months in prison, to be followed by six months of home confinement and one year of supervised release. Judgement, ECF No. 62, *United States v. Clasby*, No. 25-cr-10003-PBS (D. Mass. June 26, 2026).

In *United States v, Tommie Robinson*, Mr. Robinson, an Alabama-based doctor worked with telemedicine companies to sign medical documentation, including doctors' orders, for medically unnecessary medical equipment and genetic testing. No. 1:25-cr-10338-NMG (D. Mass. March 23, 2026). The orders Robinson signed were pre-populated based on telemarketing calls made to Medicare beneficiaries. *See* ECF No. 15 at 1-4, Gov't Sentencing Memo, No. 1:25-cr-10338-NMG (D. Mass. Feb. 17, 2025). Robinson generally did not contact the beneficiaries himself and had no provider-patient relationship with the beneficiaries. *Id.* As a result of Robinson's participation in this scheme, the suppliers and laboratories submitted over $2.7 million in claims to Medicare for durable medical equipment and genetic testing that were medically unnecessary and based on false documentation. *Id.* U.S. Senior District Court Judge Nathaniel M. Gorton sentenced Dr. Robinson to 16 months in prison, to be followed by one year of supervised release. Robinson was also ordered to pay $2,784,733.49 in restitution. ECF No. 21, No. 1:25-cr-10338-NMG (D. Mass. March 23, 2026).

In *United States v. Monica Cannon-Grant*, Ms. Cannon-Grant, the founder and former Chief Executive Officer of a Boston-based nonprofit, misused thousands of dollars in donations to Violence in Boston (VIB) to pay for personal expenses; defrauded the City of Boston out of COVID-19 relief funds and rental assistance money; and defrauded the Suffolk County District Attorney's Office out of Community Reinvestment Grant funds. ECF No. 225, Gov't Sentencing Memo, *United States v. Cannon-Grant*, No. 22-cr-10057 (D. Mass. Jan. 22, 2026). She also filed false tax returns; and failed to file tax returns for two years. *Id.* She pled guilty to 18 counts:

three counts of wire fraud conspiracy; 10 counts of wire fraud; one count of mail fraud; two counts of filing false tax returns; and two counts of failing to file tax returns. U.S. District Court Judge Angel Kelley sentenced Ms. Cannon-Grant to four years' probation, with six months of home detention and 100 hours of community service. ECF No. 227, No. 22-cr-10057 (D. Mass. Jan. 29, 2026). She was also ordered to pay restitution of $106,003 as well as forfeiture in the amount of $224,063. *See* ECF No. 234, No. 22-cr-10057 (D. Mass. March 23, 2026).

In *United States v. Joseph Ponzo*, Mr. Ponzo, a former Stoneham Police Officer, defrauded a company to obtain tens of millions of dollars of Mass Save funds through paying bribes and kickbacks to company employees. 171 F.4th 507 (1st Cir. 2026). Mr. Ponzo was ordered to forfeit §3.6 million as well as a $300,000 fine. Mr. Ponzo pled guilty to one count of conspiracy to commit honest services wire fraud, three counts of aiding and assisting filing false tax returns, 24 counts of honest services wire fraud, and one count of making false statements to government officials. Mr. Ponzo pled guilty on the eve of trial trial without a plea agreement. He was sentenced by U.S. District Court Judge Nathaniel M. Gorton to 27 months in prison, to be followed by two years of supervised release. *See United States v. Joseph Ponzo*, No. 22-cr-10094-NMG, ECF No. 173 (D. Mass. March 5, 2025).

Many of these cases are similar to Mr. Kelley's allegations, and, in most instances, the criminal conduct is significantly more egregious with larger loss amounts than the conduct at issue here. Notably, Mr. Kelley has offered a committed prison sentence either consistent with or significantly more than the similar cases mentioned above.

## VII. <u>Conclusion.</u>

Mr. Kelley committed serious offenses, and he recognizes that he will pay a significant penalty for his misconduct. His goal is to one day rejoin society and again be a productive,

upstanding member of it. Sentencing him to the substantial period of incarceration contemplated by this memorandum will afford him the chance to do so while holding him accountable for his offenses.

For the foregoing reasons, Mr. Kelley urges the Court to impose a sentence of 27 months of incarceration followed by 48 months of supervised release.

SCOTT KELLEY
By his attorneys,
CARNEY, GAUDET & CARNEY

Nat Carney

Nat Carney
B.B.O. # 709020

20 Park Plaza, Suite 614
Boston, MA 02116
617-933-0350
NCarney@CARNEYdefense.com

Hank Brennan
B.B.O. # 634036
Attorney Hank Brennan
20 Park Plaza, Suite 400
Boston, Massachusetts 02116
HB@hbjustice.com

November 17, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on or before the above date.

Nat Carney

Nat Carney

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | Crim. No. 25-cr-10355-ADB |
| SCOTT KELLEY | ) | |

**AFFIDAVIT SUPPORTING DEFENDANT'S SENTENCING MEMORANDUM**

I, Nat Carney, state that the facts contained in the attached memorandum are true to the best of my information and belief.

Signed under the penalties of perjury.

Nat Carney
Nat Carney

November 17, 2026